Lloyd W. Davidson, State's Atty., of Austin, for the State.

CALHOUN, J.

Appellant is under indictment in the district court of El Paso county charged with the forgery and passing of a check for the sum of $75.50 drawn on the Atchison, Topeka, & Santa Fé Railway Company. It seems from the record that the bail in this case was originally fixed at $1,500, and on application to reduce said bail in this case the bail was reduced to $1,000; that, when the appellant filed his application for writ of habeas corpus, wherein it was alleged that the amount of bail was excessive in this case, he was unable to furnish bond in the sum of a thousand dollars. The trial court, upon a hearing of the application, entered an order reducing the bond in the present case from $1,000 to $500, and from this order appellant has perfected his appeal. We see no reason why the bond should be further reduced, as the bail in this case as fixed by the trial judge is not excessive.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the court.

**TETENS v. TETENS et al.**
No. 7678.

Court of Civil Appeals of Texas. Austin.
Jan. 20, 1932.

Rehearing Denied Feb. 10, 1932.

Shropshire & Adkins, of Brady, for appellant.

Newman & McCollum, of Brady, for appellees.

### McCLENDON, C. J.

This suit was brought September 26, 1929, by F. (Fred) Tetens against his son E. F. (Ernest) Tetens and J. T. Short. The original petition is not in the record. F. Tetens died, and by an amended petition, filed November 1, 1930, Bruno Tetens, as administrator of the estate of F. Tetens, deceased, made himself party plaintiff, and thereafter prosecuted the suit. The amended petition is in form in trespass to try title for the recovery of 166½ acres of land. Defendants answered, asserting, among other things, conveyance by F. Tetens to Browning retaining a vendor's lien to secure purchase money notes; conveyance by Browning and wife to Ernest Tetens, who assumed payment of the notes; and subsequent payment of the notes and release of the lien. Plaintiff, in reply, denied that the notes were ever paid and alleged that Ernest Tetens had obtained possession of them by fraud and stealth. From a judgment upon a directed verdict in favor of defendants, the administrator has appealed.

The directed verdict was predicated upon the plea of payment of the notes; and the sole question which the appeal presents is whether such payment was conclusively shown.

The evidence bearing upon this issue follows:

In a partition between F. Tetens and his wife, Hulda (who were separated but not divorced), the land in suit became the separate property of F. Tetens. December 10, 1923, F. Tetens and wife conveyed the land to Browning, reserving a vendor's lien to secure twenty notes of $666 each maturing annually beginning January 1, 1925, payable to the order of F. Tetens. April 2, 1924, Browning obtained a $5,000 loan from the Federal Land Bank of Houston, $4,750 of the proceeds of which were applied to payment of the first seven notes and $88 of note No. 8; the bank's loan was secured by trust deed and made a first lien upon the land, and the remaining vendor's lien notes were made a second lien. December 15, 1924, Browning and wife conveyed the land to defendant E. F. Tetens, a part of the consideration being the assumption of the bank's note and the balance of the F. Tetens notes.

Appellees' plea of payment is based upon a release executed by F. and Ernest Tetens on June 26, 1925, and acknowledged and filed for record the following day. This instrument, after reciting the conveyance to Browning, proceeds:

"* * * And in said deed a lien was retained to secure the payment of certain notes therein described, which notes have been fully paid:

"Now, therefore, F. Tetens and Ernest Tetens, the owners and holders of said notes, in consideration of the full payment of same, have this day and by these presents released unto the grantee in said deed or his, her and their heirs and assigns, the lien retained in said deed.

"To have and to hold said land and premises unto the party or parties claiming under said deed forever free from said lien."

A letter (dated May 19, 1925, thirty eight days prior to the release), found among the papers of F. Tetens and identified as being in the handwriting of Ernest Tetens, reads:

"Dear Father:

"I received your letter and noted its contents. I am indeed glad you have had plenty of rain. We had good rains but the ground was so dry it is drying out fast. Everything is looking good including the Johnson grass that is all I get to do now is to fight the D—— stuff. It is a shame the way it has been scattered over the field.

"In regard to the back interest you mentioned I told you when you were here there was nothing coming to you as the back account you told me to settle and hold out of interests. I am enclosing itemized statement of our account and hope you will understand same.

"Now, if I was financially able to help you know I would do it, but as I told you I was in debt now. Judging from the letter you sent me Dr. Baker has satisfied the Loan Co. that he would help you thru. Hoping that you can make some arrangements.

"Your son, Ernst."

In the same envelope was an itemized statement of account showing that Ernest had paid out for his father $726.50, from which he deducted "Int. from Apri. 1, 1924 to Jan. 1, 1925 on $8570.00 @ 8%—$484.20. Bal. due E. Tetens—$242.30."

Another letter similarly identified and dated 5/30/27 (twenty-seven days before the release was executed) reads:

"Dear Father:

"After talking with you and consulting legal advise and some of your best friends they advised me not to send the notes. Now this may not meet with your approval but I think you will soon realize that I acted in your behalf. Had I taken the advise from these friends a year ago you nor I would be in this strain.

"Now if you can't raise that money send me a note covered by a mortgage on the crop in Hamilton and I will get the money for you.

"Your son,                          Ernst."

Hulda Tetens testified that Ernest got the notes from the office of Hughes an attorney. She did not attempt to fix any date in this matter. The gist of her testimony on this point is contained in the following quotation: "As to what became of these notes: Ernest came up for me to sign some papers, and the notes were lying there and he took them and said that he was going to give them to his father. No one suggested that to him, only when he started to pick them up I said 'I think that they ought to stay there.' When he started to pick them up I said that they ought to stay there in Mr. Hughes office. And he said that he was going to give them to his father. I do not know if he ever refused to give them to his father. He never did give them to him."

Hughes' testimony on this point is very indefinite. He recalled Ernest getting some notes from him at one time, but he could not identify them and could not fix any date. He did not remember whether Mrs. Tetens was present. "As to who left them there: I rather think F. Tetens or F. Tetens and Ernest Tetens together. Anyway they were left there by some one and I think it was F. Tetens."

Hulda Tetens testified to conversations with Ernest as follows: "Since the death of my husband, Mr. Tetens, I have talked to Ernest Tetens about this debt. I spoke to him about the place, if he would divide up with the other children, and he said, no, he would not. He said that he was going to keep the place, and I asked him then if he had paid for the place, and he said, well, he says —As to what Ernest said about paying the balance on the land, he said he would destroy the notes if Mr. Tetens sued him."

On cross-examination she testified: "I testified while ago that he said that he would not pay them but would destroy them first. That was after he had taken them. And another time he told me that he turned them in to that automobile outfit. But he did not."

Miss Helen Tetens, a sister of Ernest, also testified to conversations with Ernest. We quote her testimony in full:

"I have heard Ernest Tetens make a statement concerning a controversy between himself and his father and about this land transaction between Mr. Browning and Ernest. He said that Papa was trying to get him to give him the notes. He wanted to use them on other land, and that he would not let him have them; that if he sued that he would destroy them before he would let him have them as he would squander them some way and there would be nothing to take care of

him after he was old. He admitted that father wanted to get the notes.

"I never did hear any conversation between Ernest and my father about these notes. I did not. That is all that I heard him say about those notes that I remember of."

McCollum, the attorney who drew the release of June 26, 1925, called as a witness by defendants, testified:

"I wrote that release at the request of Fred Tetens and of Ernest Tetens. I discussed with Fred Tetens about it. Fred Tetens, the day this release was written, talked with me and also Ernest Tetens, and Fred Tetens told me that the land had been sold to Mr. Browning, and that Ernest had assumed the notes, and that Ernest at that time owned these notes and that they wanted the record clear. I advised them in that case, as there was no written transfer of the notes that they both should join in this release. Ernest Tetens had the notes and delivered them to me at the time I wrote the release, and they were indorsed by Mr. Fred Tetens. That was not indorsed by Mr. Tetens before me. That was acknowledged the next day, on the 27th, before Mr. Roberts, who was a Notary Public in the Commercial National Bank.

"I had possession of the notes at the time that the release was written. At the time the release was written I had the notes in my possession. They had been delivered to me. As to what Fred Tetens said to me about them being paid: He told me at that time that these notes all belonged to Ernest Tetens and he wanted to get the record clear. He stated that the land and the notes all belonged to Ernest Tetens."

On cross-examination he testified: "You say that Mr. Browning having given a warranty deed to Ernest Tetens he had to have some assurance that Ernest Tetens would not be claiming anything against him on account of this vendor's lien out against this land: But I do not know anything about that. I had nothing to do with making any deed. I knew that that deed had been prepared. I drew up that release. I did not do it at the request of and to protect Mr. Browning. I did it at the request of Fred Tetens and of Ernest Tetens. Mr. Browning was not there, and had nothing to do with it. As to whether Mr. Browning was not interested in it: He was not there and had nothing to do with that transaction. He was not present at all. I do not recall that Mr. Browning was there at any time."

The above is all the evidence having any material bearing upon the issue of payment.

Appellant interprets the release as affecting only Browning and the lien reserved in the deed to Browning. This interpretation is arrived at in the following manner: The release described the Browning deed and makes

It a part of the release by reference; the two instruments must therefore be construed together as one writing; the release expressly discharges the grantee in said deed (Browning), and not E. F. Tetens; it releases only the "lien retained in said deed," and "could not, in reason be applied to another deed, dated more than a year later, and in a different book and page of the records."

Quoting further from appellant's brief: "If you construe these 2 instruments as one writing, that, of necessity excludes the third instrument which is not referred to in the release. It was proper for F. Tetens and E. F. Tetens to join in the release to Browning, because E. F. Tetens had assumed the indebtedness to F. Tetens; and F. Tetens had received the money from the Land Bank, and agreed to hold E. F. Tetens only for the balance of the notes; but that part of the instrument was a mere receipt, and could be contradicted. True it formally discharges Browning and his assigns; but that should be restricted to subsequent assigns, and not applied to E. F. Tetens who had formerly obligated himself to pay these notes. A strange construction, this, to make E. F. Tetens to release himself from an obligation to pay over $8,000.00, by signing his own release, and without even mentioning the obligation that he is discharging from."

We are unable to concur in this interpretation of the instrument.

■ In the first paragraph there is an unequivocal assertion that the notes "have been fully paid." This statement, if true, was alone sufficient to release any lien securing the notes. The lien was only an incident to the debt, the payment of which extinguished the lien and perfected the title in the grantee and those claiming under him.

■ The instrument is not, as appellant contends, limited in its effect to Browning alone, but expressly releases the lien contained in the deed "unto the grantee in said deed (Browning) or his, and their heirs and assigns." This was an express inclusion of Ernest, who was then holding the land under grant from Browning. And this inclusion of Ernest is repeated in the habendum clause, which is "unto the party or parties claiming under said deed forever free from said lien." The fact that Ernest, who had acquired the land from Browning and assumed payment of the notes, joined in the release as co-maker, does not militate against the effect of the instrument as an unequivocal assertion and acknowledgment by F. Tetens that the notes had been "fully paid," and as a release of the lien securing them in favor of every one claiming under Browning. Joinder of Ernest in the release was wholly unnecessary from any viewpoint. If the purpose had only been to release Browning of his personal liability on the notes, the signature of Ernest was unnecessary, as he, by his assumption, was primarily liable, and Browning only secondarily so. Again, if such alone were the purpose, it was not only unnecessary, but it was improper to release the lien. Browning had parted with every interest he had in the land except the right to have it subjected to the discharge of the notes before resort could be had to his personal obligation thereon. A release of that personal obligation would obliterate every interest he held in the lien. Its release could be of no benefit to him, and could only benefit those claiming under him. We do not grasp the force of appellant's assertion that "the assigns of Browning" referred to in the lease meant *subsequent* assigns" and did not apply to Ernest "who had *formerly* obligated himself to pay these notes." There could be no assigns of Browning *after* the date of the release discharging him from his obligation on the notes, as he could then have no interest in the land or the lien which he could assign, and therefore a release of the lien in favor of such assigns would be meaningless. The instrument being an unequivocal assertion and acknowledgment of payment of the notes and release of the vendor's lien on the part of F. Tetens, defendants' plea of payment must prevail as a matter of law in the absence of evidence of sufficient probative force to warrant submitting the question to the jury as a fact issue.

■■ Viewing the evidence most strongly for appellant, we do not believe it is sufficient to meet this test. In the face of this positive testimony coming, as it does, directly from the grantor, the other testimony at most merely raises a suspicion or surmise to the contrary.

If we assume that the notes delivered by Hughes to Ernest were the notes in suit, that he had no authority at that time to take them, and that a controversy regarding their possession afterwards arose between him and his father, still all of this occurred, so far as the evidence discloses, prior to the date of the release. Neither Mrs. Tetens nor Miss Helen attempted to fix any date whatever to the conversations with Ernest regarding this controversy, and Ernest's letter to his father in which he declines to return the notes after "consulting legal advice and some of your best friends" was written twenty-seven days prior to the release. Other than the bare fact that on September 26, 1929 (more than four years after the release was executed), F. Tetens filed this suit, there is no evidence of disagreement or controversy between him and Ernest after the date of the release.

The statement of Ernest to his mother after his father's death, in which he refused to "divide up with the other children," was not an admission, nor tantamount thereto, that the notes were not paid or the land released.

The testimony of McCollum did not show, or tend to show, that the instrument was other than what on its face it purported to be, or that the facts or objects to be accomplished thereby were otherwise than as therein recited.

We think the trial court correctly directed the verdict for defendants; and we therefore affirm the judgment.

Affirmed.