Dorothy **HUDDLE** et al., Appellants,

v.

William H. **CLEVELAND**, Appellee.

No. 13036.

Court of Civil Appeals of Texas.

San Antonio.

Nov. 14, 1956.

Rehearing Denied Jan. 9, 1957.

Wm. N. Bonner, Houston, John W. Claybrook, Petry & Dean, Carrizo Springs, for appellants.

Urban Farrow, Carrizo Springs, Philip A. Kazen, Pope & Pope, Laredo, for appellee.

POPE, Justice.

William H. Cleveland filed suit in trespass to try title, and at the conclusion of all the evidence the court withdrew the case from the jury and rendered judgment that he recover thirty acres of land from his parents and his three sisters.

In 1936, plaintiff's parents, J. F. and Dora Cleveland, executed a deed which conveyed sixty acres of land to their son, William. The deed reserved an express vendor's lien in the amount of $722, and also stated that William assumed one-half of a. debt owing to the Federal Land Bank. The one-half amounted to $675. The acknowledgment to the deed was in proper form. The vendors, on May 12, 1937, filed the deed for record. From time to time William made payments on the purchase price, and in 1945 the vendors learned that their deed conveyed sixty acres of land when it should have conveyed only thirty acres. When this was called to William's attention, he executed a correction deed re-conveying thirty acres to his vendors. The correction deed was delivered to vendors and they accepted and recorded it. On November 9, 1945, the parents, without the solicitation or advance knowledge of William, executed and delivered to him a complete release of the $722 vendor's lien "and all liens" on the property described in the original 1936 deed, which the vendors referred to in their release. In 1949 and 1953, vendors and William leased their lands for oil, each receiving the bonus proportionate to their ownership. For eighteen years there was no dispute between the parties. In 1954, oil was discovered. The vendors in March of 1955 attempted to convey William's land to their three daughters, William's sisters. William then filed this suit. The vendors now contend that (1) their 1936 deed was invalid because the notary did not explain it to them, (2) they never intended that their act of recording the instrument should operate as a delivery, (3) the release did not release and William never paid the vendors' implied vendor's lien and they rescinded the executory contract, (4) they have acquired title from William by limitations.

On the basis of the parents' testimony, the trial court correctly ruled against their defenses. The evidence shows that the parents well intended to execute a deed conveying thirty acres to their son. The fact that they conveyed sixty acres by mistake is no factor in the case, for when that fact was discovered and called to the attention of their son he promptly corrected the matter by his reconveyance of thirty acres, and the parents accepted and recorded the correction deed. The mother and father testified to the same facts, but in different words, and their testimony undermines their own defenses. The mother stated that prior to 1936 they asked their son to move to Dimmit County to help them, that they told him they would sell him half their land, and they intended to do that; that the son agreed to pay a total of $1,402 for thirty acres of the land, which was only one hundred dollars less than the amount the. parents were paying for all of their sixty acres. The parents agreed to sell William half of their sixty acres if he paid for it. The mother stated: "I know that it was: the intent of myself and my husband to make a deed for thirty acres of land in favor of our son. We agreed to sell him one-half of the land and to make him a deed for it, * * * we went to the lawyer's office for that purpose. * * * We recorded the deed to our son because somebody feared the house would burn down. He did not want the house to burn and burn that deed because it was not on record. We did put the deed on record because they both wanted it on record and we put it there." William later moved to Houston. The deed had pencil notations by the mother, which showed William made small payments at irregular intervals. The mother kept these records and they showed payments in the amount of $423.30. But she testified further: "My son helped us a little bit along. He was a good son. We did not give him credit for all he sent. I am telling you we would give him credit for what was to go on the land. That part of money he sent us that did not belong on the deed, he would not tell us to keep account of it, and we spent it on taxes and insurance and groceries." When the parents discovered that the deed mistakenly

described sixty acres of land instead of thirty acres, the mother wrote her son about the mistake. The parents went to a lawyer to draw a correction deed and told the lawyer: "We told him it had been our intention to convey only thirty acres to our son if he paid for it. * * * It is a fact that our son made a deed back to us conveying thirty acres. * * * We accepted that deed and we recorded it. We recorded the deed to our son because he asked us to in case of fire." These events transpired in November of 1945, nine years after the original conveyance to their son. The mother testified concerning the release of the lien by herself and husband: "And on that very same day, November 9, 1945, at 9:00 o'clock a.m. I and my husband delivered that release to Mr. Terrell Kellog to be placed on record." Kellog was the County Clerk. "Me and my husband acknowledged that (the release) before T. B. Kellog on the day it was signed."

The father's testimony precludes his recovery. He testified: "I stated that I put that deed (the deed of 1936) to my son on record in 1937 because my son wanted to show on the records that he had an interest in the land and what he was paying for. * * * I knew I was conveying to my son a half interest in my sixty acres when I went to the lawyer's office. * * * When I made that deed to my son in 1936, signed by me and my wife, I actually intended to convey to him just one-half of that land. * * * In 1945 I was informed either by Mr. Gibson or Mr. Kellog that the deed actually included all of my land and I wanted that straightened out. At that time I did not question my son's ownership of his thirty acres." Concerning the 1945 correction deed he said: "That deed was for the purpose of definitely showing on the records what my son owned and what I owned." The father and son, in 1953, made an oil and gas lease, and the son received a bonus of $5 an acre for his thirty acres. The father said about this: "I never questioned that at the time in 1953 as being a proper division." Con-

cerning the release executed by the father and mother in 1945, the father said: "The purpose of that release was to release the vendor's lien that my son owed on the property because the deed said there was a vendor's lien note. I wanted to clear that up. I wanted to release and relinquish that vendor's lien at that time. It looks like I did do that there. I conveyed my son that 30 acres subject to the lien, and I released the vendor's lien in 1945."

The testimony of the vendors conclusively shows that they intended to convey thirty acres of land to William. They intended that he would pay them $722, and for that debt the parents reserved an express vendor's lien. They intended also that William would assume one-half of the deed of trust lien held by the Federal Land Bank. The 1936 deed so stated these things, except for the mistaken description of the land, which was corrected when the son reconveyed thirty acres to his vendors. The parents intended that they should hold the superior title until the vendor's lien was discharged. That is what the 1936 deed and the correction deed of 1945, when accepted by the parents, accomplished.

Prior to 1945, the vendors exercised no rescission. In 1945, they willingly caused the release to be prepared by an attorney of their choice. They properly acknowledged that release, recorded it, and mailed it to William without his solicitation, prior conversation or knowledge. That release stands unimpeached by proof of any fraud, accident or mistake practiced upon his parents by William. Any affirmative action for cancellation of that release is long since barred by limitations, which William pleaded. The release referred to the 1936 deed for description of the land, and then recited that the parents:

"Do hereby release, discharge and quitclaim the said lien and all liens on said property and declare said note fully satisfied and discharged."

Before the vendors executed and delivered their release they still held the superior title under their executory contract, because they reserved an express vendor's lien. When they executed and delivered the release of the vendor's lien, they divested themselves of that title. The release applied to "all liens on said property." McClure v. Fall, Tex.Com.App., 67 S.W.2d 231; Tetens v. Tetens, Tex.Civ. App., 45 S.W.2d 1018; Chouquette v. McCarthy, Tex.Civ.App., 56 S.W. 956; accord, Harvey v. Elder, Tex.Civ.App., 191 S.W.2d 686.

■ If, however, vendors should be correct in their contention that the release operated only to discharge the express vendor's lien for $722, they still are in no position to claim rescission. They reason that the consideration for the 1936 deed was in two parts. The first part was for the payment of $722, which debt was secured by an express vendor's lien, a retention of the superior title. The second part was the assumption of one-half of the Federal Land Bank loan. They claim that they retained an equitable or implied vendor's lien to secure William's paying that assumed debt. In 1943, the Federal Land Bank fully released its lien. At some time after 1945, the parents, as vendors to William, asserted they exercised their right to a unilateral rescission with reference to the unpaid implied vendor's lien. In other words, assuming the 1945 release of the express vendor's lien for $722 was valid; they assert that the release in no way surrendered their superior title which existed by force of the implied lien.

■ The release, though it be construed as releasing only the express vendor's lien, operated as a complete divestiture of the vendors' superior title. Vendors may foreclose on an implied lien, but they may not rescind as in the case of an express vendor's lien. The implied lien is not a retention of superior title, whereas an express lien may be. Johnson v. Smith, 115 Tex. 193, 280 S.W. 158; Rooney v. Porch, Tex.Com.App., 239 S.W. 910; Rhiddlehoover v. Boren, Tex.Civ.App., 260 S.W. 2d 431; 43–A Tex.Jur., Vendor and Purchaser, §§ 253, 460, 467. This distinction between executory contracts, wherein a superior title is reserved, and those in which the contract is executed, is well stated in Ransom v. Brown, 63 Tex. 188:

"The distinction between such a case and that where a bond for title is given, or an express lien reserved in the face of the deed, or of the notes, or a mortgage given upon the land to secure the payment of the purchase money, is well recognized and plainly marked by the previous decisions of this court. The former is an executed contract by which the title passes absolutely to the purchaser; the latter an executory contract, the title remaining in the seller till his claim for the consideration money is fully satisfied and discharged. * * *

"The right of the parties in each of the cases determines the remedy to be pursued in the court of a default in the payment of the consideration. The vendor in the executed contract having parted with the title cannot resume it for such default, but holding only a secured debt against the vendee must enforce that debt as in other cases, foreclosing his implied lien if he chooses. But the vendor in the executory contract has the option of two remedies: He may affirm the contract, and place himself in the same position as if it were executed, and sue for the purchase money and a foreclosure of his lien. On the other hand he may disaffirm the contract, assert his superior title in land and sue for its recovery, or convey the land to another. This latter remedy is his only available one in case the debt for the purchase money of the land is barred by limitation and the vendee sets up that defense. His right to the

land still remains, the vendee having failed to comply with his part of the contract, and virtually disaffirming it by attempting to defeat a recovery of the consideration."

We conclude, therefore, that after the 1945 release, the vendors lost all superior title and thereafter they could not exercise a rescission. No right to rescind survived after the release.

One remaining point exists. The vendors assert a limitation claim to the land. The parents were in possession of the entire sixty acres,—thirty acres which their earlier testimony described as theirs, and also the thirty acres which they called "William's." William also owned twenty adjoining acres which his parents used. The mother testified: "We used the sixty acres and the twenty acres for running livestock. He told us to. We did not have that thirty acres fenced off. We cultivated a little spot on his twenty acres. As to our paying rent, he told us to keep the taxes up and we did. We are not complaining that that rent was high. We were glad to do it." In 1953, William and his parents joined in an oil and gas lease. William received the bonus on his thirty acres and his parents received the bonus on theirs. This also happened in 1949. The father testified, "We have all of that sixty acres and our son's twenty acres. I have paid taxes on the land by agreement with my son. He told me that I could use the land and when I got my tax receipts they generally sent me his too and I went there and paid it." Possession by the parents was not hostile to but in recognition of William's ownership. They wholly failed to prove title by limitation.

We conclude that the son in 1936 bought the land, that he paid for it, and that his vendors, by a series of instruments, have fully evidenced the transaction. The judgment is affirmed.