IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

## STATE OF TENNESSEE v. CHRISTOPHER McLAWHORN

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-1679    Steve Dozier, Judge**

_____

### No. M2018-02152-CCA-R3-CD

_____

The Defendant, Christopher McLawhorn, was convicted by a Davidson County Criminal Court jury of first degree premeditated murder, first degree felony murder; especially aggravated burglary, a Class B felony; and two counts of theft of property valued at $1000 or less, Class A misdemeanors. *See* T.C.A. §§ 39-13-202 (first degree murder) (2014) (subsequently amended), 39-14-404 (2018) (especially aggravated burglary), 39-14-146 (2014) (subsequently amended) (theft). The trial court merged the first degree murder convictions and imposed a life sentence. Following a sentencing hearing, the court imposed a sentence of twelve years as a Range I offender for especially aggravated burglary, to be served consecutively to the life sentence. The court imposed sentences of eleven months and twenty-nine days for each of the two theft convictions and ordered them to be served consecutively to each other and concurrently to the life sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred in denying his motion to suppress and admitting evidence obtained from a search of his cell phone. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Jay Umerley (on appeal) and Nicholas McGregor (at trial), Nashville, Tennessee, for the Appellant, Christopher McLawhorn.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; Pamela Anderson, Jan Norman, and Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the stabbing death of Tiffany Ferguson and to the Defendant's entry into and theft of property from her apartment. The defense theory was that the Defendant was not the person who committed the offenses.

At the trial, Ali Staggs, the victim's twin sister, testified that the victim graduated from the University of North Alabama with a nursing degree in approximately 2015. Ms. Staggs said that after graduation, the victim obtained a job at St. Thomas Hospital as an intensive care unit registered nurse. Ms. Staggs identified photographs of the victim.

Melissa Thornily, who had been the victim's roommate at the time of the victim's death, testified that she met the victim in their college sorority. Ms. Thornily said that she moved to Nashville after graduation and that when the victim and Kelsey Cooper later moved to Nashville, the three of them became roommates. Ms. Thornily identified photographs of their apartment complex. She said that their front door had been accessible from the street and that the door had a keypad lock. She said that they did not have an alarm system but that the front door had an alarm that sounded if the door was shaken when locked. When asked if she had given the code to "anybody else," she said, "Yes." She said that in order to lock the door from the outside, a person must type the code and push a button. She said the back door had a key lock. She said that she worked during the day and that the victim and Ms. Cooper worked at night.

Ms. Thornily testified that when she came home from work on February 27, 2017, the victim was getting ready to go to dinner with friends and was talking with Ms. Cooper about a man the victim liked. Ms. Thornily said that she stayed home that night, that the victim left around 8:00 p.m., and that Ms. Cooper left before the victim. Ms. Thornily said she used the victim's computer to look for job listings that evening. Ms. Thornily identified a diagram and photographs of the apartment, which were received as exhibits. She identified a knife block and knives in a photograph of the kitchen.

Ms. Thornily testified that she and the victim parked in front of the apartment and normally used the apartment's front door. Ms. Thornily said Ms. Cooper parked behind a gate and normally used the apartment's back door.

Ms. Thornily testified that she went to bed around 11:00 p.m. She said that at some point in the evening, she looked at the victim's Snap Chat and that the victim appeared to be in a bar with live music. She said during the night of February 27 and the early morning hours of February 28, she never heard the door alarm. She said that at the time, she had been a "heavy sleeper." She said her bedroom was on the opposite end of the apartment from the victim's bedroom.

-2-

Ms. Thornily said she was awakened by a female screaming. She said she jumped out of bed, retrieved her cell phone and glasses, ran out of her bedroom, and saw the open front door. She said she went to the front door, looked right and left outside, and did not see anyone. She said she closed and locked the door and yelled for the victim. She said the victim did not respond. She said she ran into the victim's bedroom, saw the victim lying on her back on the bed with her head tilted back and blood coming from her open mouth. She saw injuries on the victim's right breast, underneath the right breast, and on the victim's right side. Ms. Thornily said the victim did not have a pulse. Ms. Thornily said she spoke with a 9-1-1 operator, who instructed her to unlock the front door and to pull the victim onto the floor to administer chest compressions. Ms. Thornily said she had difficulty moving the victim, who was not moving or conscious. Ms. Thornily said the victim did not react when she pulled the victim off the bed. Ms. Thornily said she performed chest compressions until the paramedics and the police arrived. Ms. Thornily said the victim took one short breath during the chest compressions. Ms. Thornily said that the paramedics took the victim to a hospital and that the police took her in a patrol car to the precinct. She said that when the police drove her around the apartment complex, she recognized the victims' purse sitting against the side of a building at the end of the street. She said the victim normally stored her purse on a hook on the front door.

Ms. Thornily testified that the police later had her walk through the apartment to identify missing items. She said a knife was missing from the knife block. She did not recall if each slot in the knife block normally was filled. She said she gave DNA and fingerprint samples to the police.

Ms. Thornily testified that she did not know the Defendant on February 27 and 28, 2017. She said he did not have her permission to be inside the apartment.

Paige Ann Stevenson Zoller, one of the victim's neighbors, testified that on a Tuesday in late February 2017, she left her apartment at 6:50 a.m. to go to work and that she saw a purse on the walkway near a gate with items strewn around. She said that she did not see anyone, that rain was falling, and that she put the items in the purse and placed it against the wall before she left for work. She said that her roommate called her later and said police were everywhere. Ms. Zoller said she left work and went to talk to detectives. She identified photographs of the purse leaning against a wall. She said she found the purse outside the gate. She said a person could exit the gate without a code but that entry required a code.

Jonathan Michael Sanborn testified that he worked with the victim in February 2017. He said he and other members of the nursing staff socialized frequently. He said he had been in a long-term relationship that had ended shortly before the victim's death.

Mr. Sanborn testified that he went out with about twelve coworkers and friends, including the victim, on the night of February 27, 2017. He said they went to several establishments using rideshare services and that they drank alcohol. He said that he, the victim, and his friend Jacob left the last establishment in a Lyft rideshare car around 2:00 a.m. Mr. Sanborn said they dropped off Jacob. Mr. Sanborn said he and the victim had been "[p]retty close friends" until this time. When asked if they had dated, he said, "Not particularly." He said that he went with the victim to her apartment and that he had not been there previously. He said that he and the victim had a physical encounter and that he was hesitant because he had just been in a long-term relationship. He said they mutually decided that he should leave and that they would talk about it later. He noted that it was 3:00 a.m. and that they had been drinking. He said the victim was in her bedroom when they talked and that he waited in the living room for about ten minutes for his Lyft to arrive. He said that when his Lyft arrived, he walked out, closed the door, and got into the car. When asked if he had "any method or ability to lock the door," he responded, "I don't know." He said he did not know whether or not he had locked the door. He said he had not asked the victim how to lock the door. He identified a copy of his Lyft receipt, which was received as an exhibit. He said it showed that the ride began at 3:13 and ended at 3:17 a.m. on February 28, 2017. He said that when he left, he had not seen anyone outside the victim's apartment. He said that he and the victim had been "some what drunk" but that she had been conscious and able to speak with and understand him when they talked shortly before he left.

Mr. Sanborn testified that when he woke the next morning, he had calls and text messages from several people he had been with the previous evening and from the victim's friends. He said that once he determined what had happened, he went to a police precinct to report what he knew because he thought he was probably one of the last people who saw the victim. He said he was interviewed and gave a DNA sample.

Nashville Metro Police Officer Frank Walker, Sr., testified that he was dispatched to the victim's apartment around 5:45 to 5:50 a.m. on February 28, 2017. He said the call to the victim's apartment had been reported as a stabbing and possible homicide. He said that when he arrived, he found two young women in the apartment. He said one woman began telling him what she believed had happened to her roommate. He said paramedics performed CPR on the victim. He said he saw a cut under the victim's left breast. He said that he followed the paramedics when they took the victim to a hospital. He said he received information at 6:06 a.m. that the victim had died and that she had nine stab wounds to her upper torso and her arms.

Officer Walker testified that earlier that around 4:45 a.m., he had responded to a report of a suspicious person "pulling on car doors" in the area near the victim's apartment. He said that when he arrived at the scene, which was a Mapco gas station, a man in a green camouflage jacket got his attention and told him the man had seen another man "pulling

car door handles" across the street near a park. He said the man in the green jacket told him the suspect was a white male wearing a jacket. He said he located three homeless people camping under the interstate, two of whom were white males. He said he talked to them but that they did not fit the description he had been given. He said a female under the interstate told him she had not seen anyone other than the people who were with her and had been with her for a while. Officer Walker said he did not see anyone other than the homeless people during his search for the suspicious person. He identified a photograph of the man with whom he spoke at the Mapco station. He said the man was white, had a beard, and wore a jacket and a hat. He said he did not see the man again.

Nashville Metro Police Sergeant Steve Wiser testified that on February 28, 2017, he responded to a call about a white male "possibly breaking into vehicles." He said the area involved in the report was frequented by homeless people. He said he parked in the back of a U-Haul business and looked inside U-Haul trailers. He said that as he drove to the location, he looked between the trucks. He said he and another officer climbed over a fence in order to see if someone might be hiding in the parking lot. He said other officers searched the area, as well. He did not recall having seen anyone during his search.

Metro Nashville Police Officer Brent Bauer testified that on February 28, 2017, he went to the scene at the victim's apartment to relieve officers who had arrived earlier in the morning. He said he arrived around 6:45 to 7:00 a.m. He said he stayed outside the apartment. He said a suspect had not yet been developed. He said that he canvassed the area and that around 11:30 a.m., he found a MacBook laptop computer and a large, bloody steak knife next to each other on the other side of a fence that bordered the interstate about one-half block from the victim's apartment. He said that he was familiar with the area, that there was a "cut through in the fence," and that homeless people frequented the area. Referring to a map, he identified the location where he found the computer and the knife. He said he notified crime scene technicians in order for them to collect the evidence. He thought the area where he found the items was outside the original crime scene containment area.

Officer Bauer testified that he reviewed surveillance video footage in connection with this case and that he identified an individual named Travis to detectives. He said he had encountered Travis previously. He said that did not know Travis's last name at the time and that Travis's nickname was "Hoover," which stood for "homeless Uber." He said that Travis was usually with "Pops."

Metro Nashville Police Officer Kenneth Wolfe, a member of the Crime Scene Investigation Unit, testified that he arrived at the scene on February 28, 2017, at 7:16 a.m. He said the victim had already been removed from the scene. He said that after consulting with Detective Chandler, they determined that they needed a search warrant and that another officer went to obtain it. He said officers guarded the front and back doors to

prevent entry until the warrant was obtained.  He said he and other officers processed the scene outside the victim's apartment while they waited for the warrant.  He said they found a rug next to a car, a hair tie, a purse at the end of the building behind a gate, a luggage tag or airline ticket with the victim's name, and jewelry.  He said it was "raining hard."

Officer Wolfe testified that after the warrant was obtained, the police searched inside the apartment.  He said a trail of blood droplets extended between the front door and the victim's bedroom, which he agreed could be consistent with paramedics transporting the victim from the apartment.  He said they found blood in the victim's bedroom on the bed, the headboard, around the headboard, on the pillows, and on the floor.  He said that the closet doors were open and that the drawers were partially open.  He said the comforter had what appeared to be puncture marks.  He said he saw an empty jewelry tree in Ms. Cooper's bedroom.

Officer Wolfe testified that he received a call at some point and learned that a knife and a computer had been found about a block away on the other side of a fence on the interstate off-ramp.  He said he went to the location where these items were discovered, photographed them, and collected them.

Officer Wolfe identified photographs taken inside the apartment and of the area outside the apartment, which were received as exhibits.  Referring to the photographs, he identified locations where evidence was found and where video surveillance cameras were placed.  He said jewelry depicted in the photographs was thirty-five to forty feet from the victim's apartment.  He identified photographs of the tree line around the fence near the interstate, and the photographs were received as exhibits.  Referring to these photographs, he identified the location where the laptop computer and knife were found.  He said he saw blood on the knife's blade and swabbed it.  A photograph of the knife and a ruler was received as an exhibit and depicted the knife's blade as measuring five and one-half inches.  The knife was received as an exhibit.

Officer Wolfe testified that he saw no signs of forced entry on the front door of the victim's apartment.  He said a door in Ms. Cooper's bedroom led to an "anteroom area" and then led to the back parking lot.  He said the back door was locked and showed no signs of forced entry.  He said a "jewelry hanger" in the victim's bedroom appeared to have "hardly anything missing, if there was anything missing."

Cortnie Bouchie, a Metro Nashville Police Department crime scene technician, testified that she was not involved in the preliminary investigation of the victim's death on February 28, 2017, but that she was called to the scene the next day to collect potential fingerprint evidence from the victim's headboard.  She said that the victim's family had moved the headboard into a truck and that she collected the evidence from inside the truck.

Ms. Bouchie testified that a few days later, she was called to a location "fairly close" to the victim's apartment to collect potential evidence. She said surveillance video showed a potential suspect enter the rear of the property, which was a secure lot with "semis and various vehicles." She said that "a metal rim[1] inside of that facility . . . had a potential shoe imprint on it" and that a "gray winter hat" embroidered with a "Nintendo controller" had been found on railroad tracks near the property. She identified photographs of the railroad tracks behind the secure lot and the locations where the evidentiary items were found. She also identified photographs of the items. The photographs and the hat were received as exhibits.

Metro Nashville Police Officer Mark Rosenfeld, a crime scene investigator, testified that he responded to the victim's apartment to collect evidence on February 28, 2017. He said he "was tasked with completing a crime scene diagram and the majority of the evidence and . . . a lot of the fingerprint processing." He identified the diagram he prepared of the area outside of the apartment, which was received as an exhibit. Referring to the diagram, he identified where a purse, a headband, a brown blanket, multiple jewelry items, and "a BNA flight ticket" were found. He said a witness identified the headband as the victim's. He said the front doormat had a reddish-brown stain. Referring to the diagram, he identified the locations of security cameras.

Officer Rosenfeld testified that the contents of the purse, which were collected as evidence, included airline flight information for the victim. Officer Rosenfeld identified the victim's bedding, which was received as an exhibit. He said the bedding contained holes and what appeared to be blood.

Officer Rosenfeld testified that he processed surfaces in the victim's apartment for fingerprints and collected samples for potential DNA evidence. He also processed surfaces outside the apartment. He identified photographs of items from which he collected samples for potential fingerprint and DNA evidence, and the photographs were received as exhibits.

Tavaran Ridley testified that he was at work at a gas station in the evening of February 27 and early morning of February 28, 2017. He said he was contacted by police about surveillance video from the station's security cameras. He said he reviewed the video footage, recorded it with his cell phone, and sent it to detectives. A recording of the video footage was received as an exhibit.

Mr. Ridley agreed that the time stamp on the footage was 4:31 a.m. and that the footage depicted a man in a toboggan approaching and speaking to him. Mr. Ridley said the man told him the police were in the area and "kind of what he was doing." Mr. Ridley

---

[1] She also described the metal rim as a "wheel well."

said he called the police and reported what the man had described. Mr. Ridley agreed that the man had been alone and that Mr. Ridley had not seen the Defendant.

Metro Nashville Police Department Forensic Scientist Supervisor Julia Hooper, an expert in fingerprint analysis and comparison, testified that rain could destroy a fingerprint left on a surface. She said that fingerprints lifted from the screen of a laptop computer collected as evidence matched Ms. Thornily's fingerprints. Ms. Hooper said she had been unable to identify the fingerprints lifted from the center island of the victim's apartment and a black LG cell phone as matching those of the victim, the Defendant, the victim's roommates, Mr. Sanborn, and police officers involved with the case. Ms. Hooper said fingerprints lifted from the victim's headboard, a car door, and the kitchen counter were of no value for comparison.

David Faulk testified that he was a jail inmate with the Defendant in March 2017. Mr. Faulk acknowledged that he had two aggravated assault convictions and a conviction for attempted false report. He said that he and the Defendant were housed together for a few weeks, that their bunks were next to each other, and that they talked daily. Mr. Faulk said he was older than the Defendant, who asked him questions because the Defendant thought Mr. Faulk "knew the system." Mr. Faulk said the Defendant asked about fingerprints and DNA. Mr. Faulk said that he asked the Defendant what the Defendant had done and that the Defendant initially said he had been "breaking into cars and stuff." Mr. Faulk said that the Defendant eventually stated he had "killed a girl in an apartment" by stabbing her. Mr. Faulk said the Defendant said he had been taking something from a table next to the victim, that the victim woke and screamed, that this scared the Defendant, and that the Defendant stabbed the victim once and "took off." Mr. Faulk said the Defendant's story evolved as he continued to talk about the killing. Mr. Faulk said the Defendant's account "went from [he had stabbed the victim once] to maybe he done it twice, to he blacked out so he didn't know how many times."

Mr. Faulk testified that the Defendant came back to jail from a hearing and asked how lengthy of a sentence he might receive. Mr. Faulk said the Defendant said his attorney had advised him that he "might get off and all of this." Mr. Faulk said that the Defendant asked for advice and that Mr. Faulk told the Defendant to tell him exactly what the Defendant had done. Mr. Faulk said the Defendant stated that he and a "buddy" had been breaking into cars, that the Defendant could not find anything to steal, that the Defendant started shaking doorknobs looking for one that was unlocked. Mr. Faulk said the Defendant stated that he was able to get inside the victim's apartment, that he took some items including an Apple computer from the living room, and that "he wished he would have left with the computer, but he got greedy." Mr. Faulk said the Defendant stated that he "stashed some stuff" outside, that he reentered the apartment, that he took a butcher knife from the kitchen "in case somebody came in with a gun or something," and that he began going into the bedrooms. Mr. Faulk said the Defendant stated that he found a woman

-8-

sleeping in one bedroom, that he closed the door, that he went to another bedroom, that it was vacant, and that he took some "jewelry and stuff" from a stand on a dresser. Mr. Faulk said the Defendant stated that he went to another bedroom, that he took some items, that he was "getting into the end table," that the victim woke and started screaming, and that he "started stabbing her." Mr. Faulk said the Defendant stated that he did not know how many times he stabbed the victim and that he stabbed her in the arm a couple of times and in the pubic area. Mr. Faulk said the Defendant stated that he "took off running," that he threw down some rings and a knife, that he jumped over a fence, that he cut his hand and face on the fence, and that he "took off running across the interstate." Mr. Faulk said the Defendant stated he went to a trucking company or mechanic shop, got into a diesel truck, took a nap, and charged his cell phone. Mr. Faulk said the Defendant stated that he woke, that he did an internet search for nearby pawn shops, that he returned to the crime scene, and that "they were taping everything." Mr. Faulk said that he asked if the Defendant was scared and that the Defendant responded, "[N]ah, it really didn't bother me?" Mr. Faulk said the Defendant stated he went to Cash America Pawn and pawned a ring for $30 or $40. Mr. Faulk said the Defendant stated that he had been interviewed by the police and that the police had taken his boots. Mr. Faulk said that the Defendant asked "if his boots could get carpet on them" and that the Defendant was concerned "the carpet might have been on his boots." Mr. Faulk said the Defendant stated that he might have blood on his shirt, that he removed some of his clothing "at a railroad track when he was running," and that he had put the clothes in a bag and left them on First Avenue behind some construction trailers. Mr. Faulk thought the Defendant was worried the police had found the clothes. Mr. Faulk said the Defendant stated that he had pulled his sleeves over his hands but that he was concerned he might have left fingerprints.

Mr. Faulk testified that the Defendant was calm and laughed when he spoke about the crimes. When asked what the Defendant said when he laughed, Mr. Faulk said, "Just like it really didn't matter." Mr. Faulk said that the Defendant became angry "after the court appearance" and that the Defendant stated he wished he had raped the victim. Mr. Faulk said the Defendant "wanted to kill" the prosecutor for mentioning in court that pornography had been found on the Defendant's cell phone. Mr. Faulk said, "[The Defendant] was more angry about [the prosecutor's mention of pornography on the Defendant's phone] than dealing with killing the girl." Mr. Faulk said the Defendant enjoyed media coverage about the case and "would go watch himself on TV." Mr. Faulk said the Defendant complained if the media used a photograph of the Defendant that was not as flattering as others. Mr. Faulk said that every time the Defendant returned from court, the Defendant watched the news to see what was said about him and that the Defendant talked about it. Mr. Faulk said the Defendant was placed "in Max" shortly after their conversation about the details of the crimes.

Mr. Faulk testified that he talked to his wife about what the Defendant had told him, that they had children, that they were sickened by the Defendant's revelations, and that Mr.

Faulk told detectives about the Defendant's admissions. Mr. Faulk said he came forward because the Defendant was "sick" and not because Mr. Faulk hoped to receive favorable treatment for his pending charges. Mr. Faulk said that he remained incarcerated after he spoke to detectives, that he pleaded guilty to a pending charge, and that his probation violation was sustained. He said he was released from custody in January or February 2018.

Nicholas Dalrymple testified that he was presently serving a sentence in Wisconsin for failing to register as a sex offender. He acknowledged a prior misdemeanor conviction for attempted sexual battery. He acknowledged additional prior convictions for criminal impersonation, felony vandalism, and two earlier convictions for failure to register as a sex offender. He said he was homeless in Nashville in 2017. He said that in February 2017, he wore a GPS device that was required as a term of his probation.

Mr. Dalrymple testified that he was in downtown Nashville drinking beer with his friend, "George," on the night of February 27, 2017. He said they were also with "another Josh," who was a guitar player, and "Josh McLawhorn," who other evidence showed was the Defendant, Christopher McLawhorn. Mr. Dalrymple said that after George "passed out" from drinking, the Defendant asked him if he would like to go to WalMart "to make some money." Mr. Dalrymple said that he had not seen the Defendant before this night and that the other people they were with did not appear to know the Defendant. Mr. Dalrymple said that he was hesitant because he did not know the Defendant but that the Defendant "kept on pushing" him. Mr. Dalrymple said he agreed to go and that they left on foot. Mr. Dalrymple said the Defendant showed him a place to store his bags of clothing and food behind some storage buildings near the riverfront and a bus terminal. Mr. Dalrymple said that as they were walking, the Defendant began breaking into cars. Mr. Dalrymple said that as they continued, the Defendant "was scaring the living hell out of" him and that Mr. Dalrymple ran across the street, beat on a gas station window, and told an employee to call the police because a man was breaking into cars and houses. Mr. Dalrymple said he waved down a police officer he saw and told the officer about the Defendant. Mr. Dalrymple said he talked to a second officer and saw a third one. He said that one of the officers told him it was okay to leave and that he did. Mr. Dalrymple said he went to a McDonald's to eat, walked back toward town, got on a bus, and saw an ambulance, fire trucks, and police cars when he was on the bus. Mr. Dalrymple said he went to a downtown McDonald's and saw a news report about the Defendant, whose clothing he recognized.

Mr. Dalrymple testified that he saw the Defendant on the evening of February 28, 2017, at the area near Ascend Amphitheater and the waterfront where Mr. Dalrymple had left his bags. Mr. Dalrymple said that he told a security guard that the Defendant "did the whole thing," that the security guard contacted the police, that the Defendant walked away quickly, and that the police yelled for the Defendant to stop. Mr. Dalrymple said that he

spoke to an investigator about where he and the Defendant had been the previous evening and that he went with officers to the locations where they had been.

Mr. Dalrymple testified that he and George were downtown sometime after February 28, 2017, and that they saw the Defendant. Mr. Dalrymple said the Defendant turned, looked at them, and "took off." Mr. Dalrymple said he notified a police officer, who ran after the Defendant and "took him down again."

Mr. Dalrymple testified that on the night of February 27, 2017, the Defendant wore a "hoodie," "cut through jeans," and round-toed cowboy boots. Mr. Dalrymple said that when he saw the Defendant on the evening of February 28, the Defendant wore a different pair of jeans, a camouflage shirt, a teal hoodie, and the same boots. Mr. Dalrymple said a hoodie referred to a separate item and not something attached to a jacket. Mr. Dalrymple was shown a photograph and said the person depicted in it was the person with whom he had walked around on February 27. The photograph was received as an exhibit. Mr. Dalrymple said the Defendant had scratch marks on his neck in the photograph that he had not had when they walked together on the night of February 27. Mr. Dalrymple identified a photograph of the storage buildings where he left his bags, and the photograph was received as an exhibit. He said the Defendant left a bag in this location, as well. Mr. Dalrymple identified photographs from surveillance footage from a gas station and outdoor locations and said they were from the night of February 27. He identified himself and the Defendant in the photographs, which were received as exhibits.

Mr. Dalrymple acknowledged that he had been unable to identify the Defendant from a photograph lineup. He agreed he had later identified the Defendant in court.

Mr. Dalrymple said that after he left the gas station where he had the employee call the police about the Defendant, he saw the Defendant again that night. He said it was not near the victim's address.

Metro Nashville Police Detective Michael Barron testified that he was assigned to patrol on February 28, 2017, and that he responded to a complaint near Riverfront Park regarding a person having seen a suspect in a murder case. He said the complainant told him the direction in which the suspect had gone. Detective Barron said that he drove in the direction the complainant had identified and that he saw a man running who matched the description the complainant had given. Detective Barron said that he ran after the man, that the man complied with his commands to stop, and that he spoke to the man. Detective Barron said that he stayed with the man for about fifteen minutes, until detectives arrived, and that the man did not try to fight or flee.

Joshua Williford testified that he was from Rocky Mount, North Carolina and that he lived in Nashville during most of 2017. He agreed he was sometimes known as "Guitar

Josh." He said he had been on tour as a musician for the past two years and that he came back to Nashville to testify at the Defendant's trial. He acknowledged that he had been arrested on outstanding warrants after his return to Nashville and that he was presently incarcerated.

Mr. Williford testified that he met the Defendant in Wilson, North Carolina, the Defendant's hometown, in early 2015. Mr. Williford said that he and the Defendant came to Nashville together in mid-2015. Mr. Williford said that the Defendant had been homeless and that the Defendant thought he "would have better opportunity [in Nashville] to do something better with his life." Mr. Williford said that the Defendant returned to North Carolina at some point and that Mr. Williford returned to visit family for Christmas in December 2016. Mr. Williford said that he and the Defendant talked about returning to Nashville and that they returned after the Defendant offered to contribute $100 for gas.

Mr. Williford testified that after he and the Defendant returned to Nashville, that he let the Defendant "sleep on the couch" of Mr. Williford's RV camper, and that the Defendant worked for about two weeks at a truck stop within walking distance from the camper. Mr. Williford said that he found a room to rent in January 2017 and that he told the Defendant to find another place to live. Mr. Williford said the Defendant stayed at a mission or with a friend. Mr. Williford said he saw the Defendant when Mr. Williford performed on the streets downtown. Mr. Williford said that he and the Defendant exchanged text messages on occasion and that once or twice, he let the Defendant spend the night in the room Mr. Williford rented.

Mr. Williford testified that he saw the Defendant sleeping under a bridge on February 28, 2017. He acknowledged he had previously testified that this occurred on March 1, 2017 around 9:00 a.m. and said March 1 was the correct date. Mr. Williford said that, by the time he saw the Defendant under the bridge, he had heard from Detective Anthony Chandler that the Defendant had been "picked up for questioning" by the police. Mr. Williford said that the Defendant woke and stood up and that Mr. Williford saw marks on the Defendant's neck, about which Mr. Williford asked the Defendant. Mr. Williford said the Defendant stated he had "caught himself" going down a barbed-wire fence. Mr. Williford described the marks as appearing "fresh" and "deep." Mr. Williford said the Defendant looked as if he "had been up all night." Mr. Williford said this occurred near Ascend Amphitheater and the Korean War Veterans' Bridge. Mr. Williford said the Defendant "ended up going back to" Mr. Williford's house. Mr. Williford said he took the Defendant to get the Defendant's bag but that the bag was gone. Mr. Williford said the Defendant left the Defendant's cell phone in Mr. Williford's truck.

Mr. Williford testified that he "believe[d]" he spoke to detectives after he saw the Defendant. Mr. Williford agreed he let the police look at and take his cell phone in early March 2017. He agreed that police officers, including Detective Chandler, came to his

house on March 7, 2017. Mr. Williford said that he spoke to the officers about the Defendant and that he let them search his truck. Mr. Williford said text messages between the Defendant and him were stored on his phone. Mr. Williford agreed he received an "interesting" text message from the Defendant in which the Defendant stated he was in custody or being interviewed by detectives. Mr. Williford agreed that the Defendant asked in the message for Mr. Williford to tell the police "that all he had was the clothes on his back" if the police contacted Mr. Williford. Mr. Williford said he knew the Defendant had more than just the clothes on his back. Mr. Williford did not recall when he received this text message in relation to taking the Defendant to retrieve the Defendant's bag. Mr. Williford thought the Defendant was trying to get Mr. Williford "to cover for something."

Mr. Williford testified that when he was interviewed by police, they had him review surveillance footage and that he recognized a person in a "toboggan-like hat in the area of an apartment complex" as the Defendant. Mr. Williford said he recognized the distinctive way the Defendant adjusted his pants, the way he walked, his boots, and his toboggan. Mr. Williford identified photographs of his truck and the Defendant's cell phone inside the truck. The photographs were received as exhibits. Mr. Williford agreed he allowed the police to seize items from his truck.

Metro Nashville Police Department forensic scientist Rachel Mack, an expert in serology and DNA analysis, testified that she examined evidence related to this case. Regarding evidence submitted on March 3, 2017, and discussed in her March 8, 2017 report, she said a sample from the "downside" of the knife blade collected as evidence contained a mixture of DNA from two people. She identified one of the DNA profiles as being consistent with a sample collected from the victim. She said that additional swabs of the knife contained the DNA of one person, whom she identified as having a profile consistent with that of the victim. Ms. Mack said the victim's fingernail clippings and scrapings contained male DNA. She said she was able to assume the presence of the victim's DNA but that she could not make a comparison from the available sample for the foreign DNA. Ms. Mack said a black hooded jacket belonging to "Travis Baril" contained DNA that was consistent with the profile of Mr. Baril. She said that a profile consistent with Jerry David Rochelle was consistent with samples collected from the jacket. She said that the victim could be excluded as the contributor of the other DNA present on the jacket. She said that DNA from at least two other individuals was on the jacket but that she could not create comparisons due to the complexity of the profile. She said samples collected from a Batman t-shirt belonging to Mr. Baril matched Mr. Baril's DNA profile and that the victim's DNA was not consistent with the DNA profile present in the sample.

Ms. Mack testified that a sample from jeans owned by Jerry Rochelle contained a mixture of DNA consistent with Mr. Rochelle and an unknown individual. She said the victim's DNA profile was excluded. Ms. Mack said two other samples from Mr. Rochelle's jeans contained DNA profiles that were consistent with Mr. Rochelle and Mr.

-13-

Baril and that the victim's DNA could be excluded as the source of other minor DNA data present. Ms. Mack said mixtures of DNA were present on samples collected from a sweatshirt owned by Mr. Rochelle. She said that Mr. Rochelle's DNA was identified and that the victim was excluded as a contributor.

Ms. Mack testified that a sample collected from the knife contained a mixture of DNA from at least two people and that due to the complexity of the mixture, she could not use the sample for comparisons. She said that a sample from Mr. Baril's black t-shirt contained a complex mixture of DNA from three people and that comparisons could not be made due to the complexity of the mixture.

Ms. Mack testified that a limited amount of male DNA was present in a sample collected from the victim's mouth but that the sample size was too small for further analysis. She said it was "possible" for DNA to be transferred through kissing or placing a hand over a person's mouth. She could not determine whether the DNA present with the victim's fingernail clippings and scrapings was from a male contributor.

Ms. Mack testified that she made her DNA comparisons for the evidence discussed in her March 8, 2017 report with samples collected from the victim, Ms. Thornily, Ms. Cooper, Jonathan Sanborn, Travis Baril, Ryan Liggett, and Jerry Rochelle.

Ms. Mack testified that she analyzed evidence submitted on March 6, 2017, which was discussed in her March 10, 2017 report. She said she received DNA standards collected from the Defendant, Nicholas Dalrymple, and Steven Warren for use in her comparisons.

Regarding a Nike shirt found in a backpack inside a tent, Ms. Mack testified that a mixture of DNA was present. She said the profile for one of two partial major contributors matched Mr. Rochelle's profile and that all other known DNA profiles were excluded as the source of the other partial major profile. She said that a DNA mixture of three contributors was present on a leather watchband and that she could not use the sample for comparisons due to the sample's complexity. Ms. Mack said no comparisons could be performed on (1) a sample from a gold rope necklace, (2) a gold necklace with cream beads and a feather, and (3) cuttings from a stain below the knee of Mr. Baril's jeans, due to the limited quantity of DNA present. Ms. Mack said no DNA was detected on (1) a gold necklace with cream and gold charms, (2) a black and gold chain necklace, and (3) a silver chevron necklace with glass beads. She said DNA was detected on a gold necklace with a black moon but that the amount was insufficient for further analysis.

Ms. Mack testified that she compared the DNA standards collected from the Defendant, Mr. Dalrymple, and Mr. Warren with the evidence discussed in her March 8,

2017 report. She said the standards for these individuals were excluded from being the source of the DNA profiles present on those items.

Ms. Mack testified that she analyzed additional evidence, which was discussed in her March 21, 2017 report. Relative to a gray knit hat with a Nintendo patch, she said that she found the presence of the Defendant's DNA inside the hat, that the known standards excluded all other individuals as contributors, and that a minor DNA profile was present but was unsuitable for comparison. She said that the outside of the hat contained a mixture of DNA from three people and that the mixture was unsuitable for comparison. She said the DNA present on shoelaces from a pair of brown Sketchers boots found next to a wooden barrel matched Mr. Baril's profile and that the DNA from the other standards submitted were excluded.

Ms. Mack testified that the ear area of a black LG cell phone contained DNA from at least two people but that she could not use the sample for comparison due to the complexity of the mixture. Regarding samples from the "front rivet side of the knife," the "handle [seams] between the halves," and the "rear rivet on the right side handle of the knife," she determined that male DNA was present, but she could not conduct comparisons due to the small amount of DNA present. She said no DNA was detected on the "mid-rivet on the left side."

Ms. Mack testified that rain could deteriorate or dilute DNA to the extent that its presence might no longer be detected. She agreed that DNA testing could not determine when DNA was deposited on a surface.

Metro Nashville Police Detective Brittany Shoesmith testified that she responded to the scene at the victim's apartment around 6:20 a.m. on February 28, 2017. She said the victim had already been transported to a hospital when Detective Shoesmith arrived. She said she did not observe any sign of forced entry into the victim's apartment's front door. She said that multiple knives were missing from a knife block in the apartment and that she did not see knives lying around the apartment. Detective Shoesmith saw blood droplets outside, which Detective Riley stated he thought were left when the victim was taken from the scene. Detective Shoesmith noted blood in the victim's bedroom, a gas can next to a car in the apartment complex's parking lot, a "furry or fussy-type coat or blanket" next to a car, and a purple headband nearby. Detective Shoesmith said she learned later that the victim's purse had been found near the end of the apartment building.

Detective Shoesmith testified that she was present when Detective Chandler interviewed Mr. Dalrymple. She agreed that Mr. Dalrymple had been unable to identify the Defendant in a photograph lineup of six individuals but that Mr. Dalrymple had identified the Defendant when shown additional photographs.

-15-

Detective Shoesmith testified that she was present with Detective Chandler for an interview of the Defendant. She identified a photograph of the Defendant taken at the time of the interview, which she said depicted the Defendant in a long-sleeved camouflage shirt. She identified a photograph of the hat the Defendant wore during the interview. The photograph depicted a teal beanie cap with two stripes, three stars, and a logo depicting a hornet with a basketball. She agreed the Defendant was taken into custody at the end of the interview.

Detective Shoesmith testified that she went to the hospital to view the victim's body and the injuries. Detective Shoesmith said the victim had multiple stab wounds to her chest and breast area. Detective Shoesmith said a person named "Ryan" was at the hospital. She said she learned from one of the victim's roommates that Ryan had heard something happened to the victim and that he went to the hospital to check on the victim. Detective Shoesmith said Ryan was upset when she and Detective Chandler informed Ryan that the victim had died. Detective Shoesmith described Ryan as the victim's boyfriend and said he had wanted to "be there for his girlfriend."

Detective Shoesmith testified that Ryan and the victim's roommates agreed to go to the precinct to provide information for the investigation to Detectives Shoesmith and Chandler. Detective Shoesmith said the interviews were recorded.

Detective Shoesmith testified that she returned to the scene and that she reviewed surveillance video from the apartment's security cameras. She said she returned to the precinct after learning that Mr. Sanborn had gone to the precinct and asked to speak to a detective. She said Mr. Sanborn was "extremely cooperative and very saddened." She said he provided names and phone numbers for people with whom he and the victim had been on the night of February 27, 2017. Detective Shoesmith said Mr. Sanborn agreed to provide a DNA sample and to allow the police to photograph him.

Detective Shoesmith testified that she and Detective Chandler returned to the scene again to do additional canvassing of the area to speak with neighbors and people who might frequent the area. She said that the police were aware of "Pops," who was known to frequent the area, and that she and Detective Stivic located and spoke with Pops. She also identified Pops as "Mr. Wilkins." She said Mr. Wilkins stated that he had lain under a nearby interstate bridge the previous night and that he did not recall anyone's having come under the bridge between 4:00 and 6:00 a.m. She said they asked Mr. Wilkins if he was familiar with a tall, thin, white male with a limp or distinctive walk wearing a "darker black hoodie," distinctive jeans, and boots. She said they asked about people who engaged in "car hopping," which she said was tugging door handles to see if a door had been left unlocked. She said Mr. Wilkins stated that a man named "Travis" was known to car hop and that the man matched the general description they provided. She said Mr. Wilkins

stated he had not seen Travis recently but that Travis lived with Travis's brother, David, at a homeless camp near the fairgrounds.

Detective Shoesmith testified that she and Detective Chandler identified Travis Baril after receiving the information from Mr. Wilkins. She said Detective Chandler learned from other officers that Mr. Baril's nickname was "Uber." She said that later that night, she and Detective Chandler went to a hospital after learning that Mr. Baril had been taken there for a medical issue. She said Mr. Baril agreed to go to the precinct to speak with them after he was released from the hospital. She said Mr. Baril's interview was recorded. She identified photographs taken of Mr. Baril on the night of February 28, 2017. She identified photographs of Mr. Baril's clothing and said none of them matched what the police "were looking for from the video." She said Mr. Baril had not worn cowboy boots. She said a photograph depicted Mr. Baril's stomach tattoo. She said she and Detective Chandler spoke with David Rochelle the next day. She said Mr. Rochelle lived at the same homeless camp as Mr. Baril. She said that Mr. Rochelle was cooperative and that he consented to be photographed. Referring to photographs of Mr. Rochelle, Detective Shoesmith said he had not worn cowboy boots. She said he had a red substance on his jeans, which she said was a chemical or paint. She said Mr. Rochelle had not worn a long-sleeved, dark hoodie. She said Mr. Rochelle had a tattooed arms and a sun tattoo on his chest. She identified a photograph of Mr. Rochelle's back.

Detective Shoesmith testified that she later learned about the existence of surveillance video from a location near the victim's apartment. She said the location was near railroad tracks and the interstate. She said she reviewed the video, which showed a tall, thin, bare-chested white male carrying an article of clothing, wearing jeans, running across a train track, and jumping over a fence "over into this business." She said the video had been recorded at 5:55 a.m. on February 28, 2017, within twenty minutes of the events at the victim's apartment. She said the man in the video did not have a back tattoo, unlike Mr. Baril. She said the man in the video wore his hair in a different style than Mr. Baril or Mr. Rochelle. She said the man in the video appeared to have a patch of hair on his lower back, which she did not recall from photographing Mr. Baril or Mr. Rochelle.

Metro Nashville Police Detective Zachariah Beavis testified that, at the direction of Detective Chandler, he collected surveillance video that had been obtained by the Surveillance and Technical Support Unit. He said he responded to a call from Officers Hosman and Barren on the evening of February 28, 2017, to go to the Ascend Amphitheater in downtown Nashville. Detective Beavis said that when he arrived, the Defendant was standing with the officers and that Detective Beavis was advised that the Defendant may have been involved or had information about a homicide. Detective Beavis said he asked the Defendant about cuts on the Defendant's interior hand and neck and that the Defendant stated he had been in a fight. Detective Beavis identified a photograph of the Defendant, who wore "a Charlotte Hornets beanie, camouflaged pullover, blue jeans and cowboy

boots." Detective Beavis said this was the clothing worn by the Defendant when Detective Beavis saw the Defendant on the evening of February 28. Detective Beavis identified additional photographs of the Defendant, which Detective Beavis said were taken when the Defendant went to the precinct that evening. Referring to the photographs, Detective Beavis identified the black LG cell phone and white earbuds the Defendant had with him on the evening of February 28. The photographs were received as exhibits. Detective Beavis said the Defendant voluntarily provided a DNA sample. Detective Beavis said that the Defendant was allowed to leave after detectives spoke with him and that he allowed the Defendant to charge the Defendant's cell phone before leaving.

Detective Beavis testified that on March 1, 2017, he and Detective Chandler went to the location where Mr. Baril camped and that Mr. Baril voluntarily provided a pair of jeans. Detective Beavis said he and Detective Chandler had been searching for clothing worn by the suspect as depicted in surveillance video footage. Detective Beavis said that other pairs of jeans were at the homeless camp but that the pair they collected was similar to the ones in the video. Detective Beavis identified photographs of the pair of jeans they collected, which were received as exhibits. He agreed that the jeans had a large hole or rip and that the left thigh was "spilt basically from the pocket down to the knee."

Detective Beavis testified that he and Detective Chandler returned on March 3, 2017, with a search warrant for the homeless camp where Mr. Baril lived. Detective Beavis identified photographs of the homeless camp, which were received as exhibits.

Detective Beavis testified that he returned with other officers to the area outside the victim's apartment in order to better understand the area and where evidentiary items were found. He said that while following a possible path, he saw a "beanie" with an "old NES Nintendo Entertainment System remote control picture" on it lying on railroad tracks near a trucking company, which he said he did not recognize at the time as having evidentiary value. He said he saw a truck wheel rim with a boot print inside the trucking company's fence.

Detective Beavis testified that police "CSI" units returned to the area on March 5, 2017, and that they took photographs and documented the locations of items he had located. He identified photographs of a route he walked, which depicted roads, trails, railroad tracks, the trucking company's "back lot," a barrier fence between Ridley Street and the interstate, a raised "berm" area near the fence, and surveillance cameras. He identified the area where the victim's laptop computer and the knife from her apartment were found. He said the fence depicted in the photographs had a "gap cut" in one location. The photographs were received as exhibits.

Detective Beavis testified that when he returned to the scene later, the beanie was still on the railroad tracks. He said he had been advised since his previous visit to the area

that the Defendant had a social media post of himself wearing this beanie or a similar one. He said Detective Stivic removed it from the train tracks.

Detective Beavis testified that the boot print on the tire rim was similar to the boot print from the boots the Defendant wore on the night Detective Beavis interviewed the Defendant. A photograph of the bottom of the Defendant's boot had been previously received as an exhibit.

Detective Beavis testified that Detective Chandler reviewed the video surveillance footage of a person "jumping the fence" and determined that the person had jumped the fence within about fifteen minutes of the time reflected on video surveillance footage at the crime scene. Detective Beavis said he went to the scene and physically ran the route from the victim's apartment to the fence line where the victim's laptop computer and the knife from her apartment were found, that he jumped the fence, that he began at 5:39 a.m., and that it took him "[j]ust over six minutes" to complete the run and to jump the fence.

The jury was informed of several stipulations of fact. First, the parties stipulated that the time stamp on video surveillance footage from U-Haul was two minutes ahead of the correct time. Second, the parties stipulated that the time stamp was correct but the date stamp was incorrect for video surveillance footage from the exterior of Advance Financial Business. Third, the parties stipulated that the time stamp on video surveillance footage from 700 Wedgewood Park was "correct within one minute." Fourth, the parties stipulated that the time stamp on video surveillance footage from 760 Wedgewood Park was one hour and seven minutes ahead of the correct time. Fifth, the parties stipulated that the time stamp on video surveillance footage from Truck Center, Inc. was twenty-two minutes behind the correct time. Sixth, the parties stipulated that the time stamp on video surveillance footage from Cash America Pawn was correct. The computer storage devices containing the video surveillance footage were received as exhibits.

Metro Nashville Police Detective Anthony Chandler, the lead detective in the victim's homicide, testified that he was called to respond to the scene at the victim's apartment before 7:00 a.m. on February 28, 2017. He said Detectives Stivic and Shoesmith were among the responding officers.

Detective Chandler testified that the scene had been secured by officers who arrived before he did. He said that he noticed several small blood drops on the walkway into the apartment building and in the apartment's hallway, which were believed to have been dropped when the victim had been transported to the hospital. He said the victim would have been transported if emergency personnel thought her life might be saved but that her body would have been left at the scene if she were deceased. He said the victim's driver's license lay on a counter.

Detective Chandler testified that the victim's roommates were taken to the precinct to provide information. He said that they were upset when a chaplain informed them of the victim's death but that they provided information that assisted in the investigation. He said Mr. Liggett was also informed of the victim's death and was interviewed. He said that Ms. Thornily, Ms. Cooper, and Mr. Liggett consented to provide DNA samples.

Detective Chandler testified that he had gone to the hospital to view the victim's body before interviewing Ms. Thornily, Ms. Cooper, and Mr. Liggett at the precinct. Detective Chandler said that he and Detective Shoesmith were told that Mr. Liggett was at the hospital and that they were incorrectly informed that he was the victim's boyfriend. Detective Chandler said that Mr. Liggett was Ms. Cooper's boyfriend. Detective Chandler said Mr. Liggett agreed to give a statement at the precinct.

Detective Chandler testified that after the interviews, he and Detective Shoesmith returned to the scene around 11:00 a.m. He said that he obtained video surveillance recordings from three apartment buildings near the victim's apartment. He said one of the recordings showed a white male wearing ripped and faded jeans, a dark hooded sweatshirt, and "what appeared to be a hat." Detective Chandler said the recording showed the man walking toward the victim's apartment and activating the flashlight function on his cell phone. He said the timing on the recording was incorrect but that it depicted something that happened shortly before the 9-1-1 call was received. He said the video was released to the media in an attempt to obtain additional information from the public about the person's identity.

Detective Chandler testified that he received information that a MacBook computer and a kitchen knife with what appeared to be blood were found on the other side of a fence along an interstate exit ramp. He said he had the DCS unit process and collect the evidence.

Detective Chandler testified that he and Detective Shoesmith returned to the precinct when they learned Mr. Sanborn was there and wanted to speak to the detectives in charge of the case. Detective Chandler said that Mr. Sanborn was upset and cooperative and that Mr. Sanborn provided information to assist with the investigation. Detective Chandler said that Mr. Sanborn showed them information on his cell phone regarding his use of a rideshare service and that he voluntarily provided a DNA sample.

Detective Chandler testified that surveillance video was played at officer roll call on the afternoon of February 28, 2017. He said a couple of officers thought they recognized the person in the video as "Travis" or "Huber." Detective Chandler said Huber was a nickname for "homeless Uber." He said that after conferring with Detectives Shoesmith and Stivic, he determined that this person was Travis Baril. Detective Chandler said that an alert to officers was placed for Mr. Baril and that he received a notification shortly thereafter that Mr. Baril was at a hospital.

Detective Chandler testified that he went to the hospital and spoke to Mr. Baril. Detective Chandler said that he asked Mr. Baril about car hopping and that Mr. Baril cooperated by answering questions and allowing Detective Chandler to look at his clothing. Detective Chandler said Mr. Baril's clothing did not match what had been in the video footage. Detective Chandler said Mr. Baril agreed to go to the precinct for further questioning after Mr. Baril was released from the hospital. Detective Chandler identified the DNA sample and consent form provided by Mr. Baril, and they were received as an exhibit. Detective Chandler said that Mr. Baril had a small circular mark on his bicep that was determined to be a bite mark and that Mr. Baril provided information about the source of the injury that did not relate to the victim's homicide.

Detective Chandler testified that Mr. Baril agreed to allow detectives to accompany him to his homeless camp. Detective Chandler said he found jeans with what appeared to be new damage, which he described as a rip that might have been from an attempt to destroy them. Detective Chandler said Mr. Baril consented for the police to take the jeans. Detective Chandler said Mr. Baril agreed to allow the police to take his black LG cell phone. Detective Chandler said that after the cell phone was searched pursuant to a search warrant, the police determined that no information of evidentiary value was stored on the cell phone. The cell phone was received as an exhibit.

Detective Chandler testified that he returned to the homeless camp during daylight hours on March 1, 2017. He said several items of clothing were collected for laboratory analysis. He identified a photograph of Sketchers boots collected from Mr. Baril and a photograph of Ozark boots collected from the homeless camp. The photographs of the boots were received as exhibits.

Detective Chandler identified a "blood spot" and fingerprints obtained by the medical examiner during the victim's autopsy, and they were received as exhibits.

Detective Chandler testified that after speaking with Mr. Baril and other potential witnesses, Detective Chandler wanted to speak to Jerry David Rochelle and placed a police alert for Mr. Rochelle. Detective Chandler said he later spoke with Mr. Rochelle, who voluntarily provided a DNA sample and allowed police to photograph him. Detective Chandler said he did not observe significant injuries when Mr. Rochelle removed his shirt for the photographs.

Detective Chandler testified that, based upon information received in the investigation, he placed a police alert for Steven Warren. Detective Chandler said Mr. Warren voluntarily came to the precinct, gave a statement, provided a DNA sample, and permitted the police to photograph him. Detective Chandler identified photographs of Mr. Warren, whom he said wore camouflage pants, a camouflage shirt, and a hat. Detective

Chandler said Mr. Warren had "very visible" tattoos on his back, unlike the person in some of the surveillance footage. Detective Chandler said he examined the sole of Mr. Warren's boot. Photographs of Mr. Warren and his DNA sample were received as exhibits.

Detective Chandler testified that the police obtained the gas station surveillance video from about 4:30 a.m. on February 28, 2017, from Mr. Ridley. Detective Chandler said the video recording was sent to other officers and that one identified the person in the recording as Mr. Dalrymple. Detective Chandler said he placed a police alert for Mr. Dalrymple and was able to speak with and obtain a DNA sample from him. Detective Chandler said he determined that a person Mr. Dalrymple referenced in his statement was the Defendant. Detective Chandler said Mr. Dalrymple showed him points of interest that were relevant to the case. Detective Chandler said he obtained GPS coordinates for Mr. Dalrymple from the GPS monitor Mr. Dalrymple wore due to Mr. Dalrymple's status as a sex offender.

Detective Chandler testified that the police obtained surveillance video from additional businesses near the victim's apartment and from Metro video cameras downtown. Video footage was played for the jury, and Detective Chandler described what the footage showed. He said a recording from 2:36 a.m. showed the victim and Mr. Sanborn getting out of a car and walking into the victim's apartment. He said a recording from 3:13 a.m. showed Mr. Sanborn leaving the apartment and getting into a Lyft car. He said recordings from various cameras in downtown Nashville showed Mr. Dalrymple and the Defendant at 2:51, 2:59, 3:13, 3:15, and 3:18 a.m. Detective Chandler said that Mr. Dalrymple wore the same clothing as seen in the video recording from the gas station and that the Defendant wore a hooded jacket over a t-shirt, faded jeans, and a dark knit hat. Detective Chandler said the recordings from 2:51, 2:59, and 3:20 a.m. showed Mr. Dalrymple and the Defendant walking downtown near blue boxes where homeless people hid their belongings. Detective Chandler said the recordings showed the direction in which Mr. Dalrymple and the Defendant walked. Detective Chandler said the police had been unable to locate Mr. Dalrymple and the Defendant on any other surveillance footage until they were near the victim's apartment. Detective Chandler said video recording from 4:43 until 4:55 a.m. from U-Haul near the victim's apartment showed officers patrolling and searching the area after the 9-1-1 call about a suspicious person pulling on car door handles.

Detective Chandler testified that five cameras near the victim's apartment showed the Defendant's movements during the crimes. Detective Chandler said the video recordings showed a man walking around cars parked near the victim's apartment. Detective Chandler said the man entered one of the cars for about twenty seconds at 5:06 a.m. Detective Chandler said a recording showed a person with an item under his right arm walking on a sidewalk at 5:09 a.m. Detective Chandler said the man wore a zip-up hooded jacket with a shirt visible underneath, a gray knit hat, and pants with "discoloration on the back," which he described as the same clothing the Defendant had worn in the

surveillance video from downtown Nashville earlier in the evening. Detective Chandler said the man activated the flashlight function on his cell phone and walked toward and entered the victim's apartment at 5:10 a.m. Detective Chandler said the man could be seen at 5:13 a.m. walking and holding the purse and laptop that were recovered as evidence in this case. Detective Chandler said the man placed the purse and laptop near a utility box, which he said was the location where jewelry taken from the apartment was recovered. Detective Chandler said no people other than the man were recorded walking around outside the victim's apartment during the time the man is shown on the recordings. Detective Chandler said the man made multiple trips in and out of the victim's apartment. Detective Chandler said a recording showed the man going to the utility box at 6:14 a.m., retrieving items "stashed on the other side of the electrical box," and walking around the corner of an apartment building toward the interstate while holding what appeared to be a flashlight. Detective Chandler said the "flash of the silver on the laptop" in the man's hand was visible in a recording from 5:16 a.m. Detective Chandler said that a recording from 5:18 a.m. showed light moving around, which he said was "almost like they are on the other side of the fence itself," and that the laptop and the knife were found farther along the other side of the fence. Detective Chandler said a recording showed the man walking back toward the victim's apartment at 5:20 a.m. Detective Chandler said that the surveillance cameras did not detect any activity for eleven minutes after 5:20 a.m. and that at 5:32 a.m., a recording showed the Defendant and "light from the flashlight again" moving toward the "opposite side of the utility box." Detective Chandler said the Defendant crouched down where the jewelry was later recovered. Detective Chandler said that the Defendant was "about to make his way back to the apartment" at 5:32:31 a.m., that the Defendant ran from the apartment at 5:39:16, and that the 9-1-1 call was received at 5:39:59. Detective Chandler said the Defendant held a flashlight and wore a beanie in the video. Detective Chandler said video surveillance captured the Defendant's image as he fled the area. Detective Chandler said the surveillance footage showed no one walking on the sidewalk near the victim's apartment between Mr. Sanborn's departure and the Defendant's arrival. Detective Chandler later said a recording from U-Haul at 4:43 a.m. showed Mr. Dalrymple speaking to a police officer and a second person walking past police officers.

Detective Chandler testified that surveillance footage from a trucking business showed a shirtless man jump over a fence. Detective Chandler said "there is no longer a beanie on the head," and he noted a distinctive balding pattern, facial hair, and an absence of tattoos. He said the absence of tattoos helped the police distinguish this individual from three others with whom they spoke. Detective Chandler said that the recording showed the man's foot land on a rim and that the footprint and tread appeared to be the same as on the boots the Defendant wore when he was photographed at the precinct. Detective Chandler noted that in a recording, the man's back hair "was almost an upside down triangle" and that he had a considerable amount of chest hair.

-23-

Detective Chandler testified that surveillance video from Advance Financial showed the Defendant entering at 8:58 a.m. He noted the marking on the back of the Defendant's pants and the "same dark hooded sweatshirt" as seen in earlier recordings. Detective Chandler said the Defendant left the business at 9:07 holding a cell phone and charging cord.

Detective Chandler testified that he showed a photograph lineup containing the Defendant's photograph to Mr. Dalrymple. The lineup was received as an exhibit.

Detective Chandler identified a black Kyocera cell phone the police obtained from Mr. Williford on March 23, 2017. Detective Chandler said Mr. Williford, who was also known as "Guitar Josh," was "the central person that everybody kind of hung around with." Detective Chandler said the police determined that Mr. Williford and the Defendant spent a "considerable amount of time" together and that the Defendant came to Nashville with Mr. Williford. The cell phone was received as an exhibit.

Detective Chandler identified photographs of the Defendant taken on March 5, 2017, and they were received as exhibits. Detective Chandler noted the absence of tattoos and the hair patterns on the Defendant's torso, head, and face as being like those in the video recordings.

Detective Chandler identified the Defendant's black LG cell phone, which was received as an exhibit. Detective Chandler said he obtained the cell phone from Mr. Williford. He said he met with Mr. Williford at Mr. Williford's house, that Mr. Williford consented to a search of his truck, and that the cell phone was collected from the truck.

Detective Chandler testified that the arrest warrant was issued on March 9, 2017, and that the preliminary hearing took place on March 16, 2017. He said he received information on March 22, 2017 that an inmate, David Faulk, wanted to speak with detectives regarding the present case. Detective Chandler said that after speaking with Mr. Faulk, the police were able to corroborate his information about the Defendant's having pawned a ring at Cash America on February 28, 2017, through a database for pawned items. Detective Chandler said the police had not received any information about the Defendant's having pawned items before Detective Chandler spoke to Mr. Faulk. Detective Chandler said he and Detective Shoesmith obtained the paperwork and the ring from Cash America and that the pawn receipt showed the Defendant as the person who pawned the ring for $40. The pawn receipt was received as an exhibit.

Detective Chandler testified that, after his visit to Cash America, the Surveillance and Investigative Support Unit (SISU) unit obtained surveillance video footage from the business for February 28, 2017. He said video from 9:24 a.m. showed that the Defendant came into the store wearing the same hoodie and jeans as had been shown in the earlier

recordings but no longer wearing the gray hat. Detective Chandler said the video showed the Defendant pawning the ring, completing paperwork, and receiving money. Detective Chandler noted the Defendant's calm demeanor during the transaction. Detective Chandler said Pawn America was within walking distance from the victim's apartment.

Detective Chandler testified that surveillance video from downtown Nashville at 10:38 a.m. on February 28, 2017, showed the Defendant walking toward the blue boxes near where homeless people hid belongings. Detective Chandler noted that the Defendant wore the same clothing as had been shown in the earlier recordings, except he no longer wore the gray cap. Detective Chandler said surveillance video from 10:39 a.m. showed the Defendant changing clothes between the boxes. Detective Chandler said that the Defendant retrieved other clothes from a bag and that he held up his hooded sweatshirt and shirt and examined them after removing them. Detective Chandler said the Defendant moved around between the boxes for ten to fifteen minutes. Detective Chandler said that the Defendant emerged from the area of the boxes at 10:58 a.m. and that, at this point, the Defendant wore the clothes he wore later that evening when Detective Beavis saw him. Detective Chandler said that the video showed the Defendant going to several garbage cans, that the Defendant "spen[t] some amount of time with each one of them," and that the video did not show whether the Defendant placed anything in the cans.

Detective Chandler testified that he went to the area with Mr. Dalrymple, that Detective Chandler looked for bags of clothing consistent with information the police had received, and that he later reviewed the video footage to determine the time the Defendant had been there. Detective Chandler said he was unable to locate any items of interest, including the hooded sweatshirt, either time he went to this location. Detective Chandler said that the area was maintained by "public parks" and that they disposed of items left there.

Detective Chandler testified that a February 28, 2017 surveillance video from around 6:00 p.m. showed the Defendant between the storage boxes again. Detective Chandler said Mr. Dalrymple saw the Defendant at about 6:32 p.m. and notified a security guard to call the police.

Detective Chandler testified that the police obtained the Defendant's boots by executing a search warrant. The boots were received as an exhibit. Detective Chandler said the boots had the same tread pattern as the one he had seen on the tire rim from the trucking company. He said that he compared the print on the tire rim to the tread shown in photographs of other boots and that they did not match.

The parties stipulated that the 9-1-1 Communications Center received a call from Ms. Thornily at 5:39:59 a.m. on February 28, 2017.

Miguel Laboy, M.D., a medical examiner and forensic pathology expert, testified that he performed the autopsy of the victim. He identified his report and autopsy photographs, which were received as exhibits. He said the victim's date and time of death were February 28, 2017, at 6:06 a.m. He described an abrasion, incisions, and stab wounds to the victim's hands, fingers, arm, chest, groin, abdomen, and buttock. He said he could not determine the order in which the wounds were inflicted.

Dr. Laboy testified that a stab wound to the victim's right chest was three and seven-eighths inches deep. He said the victim's right lower lung was perforated, which would have caused the vessels inside to "bleed out" and compress the lung. He said the victim's liver and diaphragm were also perforated and would have bled.

Dr. Laboy testified that another chest stab wound measured one inch in length and two and five-eighths inches in depth. He said that the victim's rib was cut and that the upper lobe of her right lung was penetrated. He said another chest stab wound was two and one-eighth inches long, five and one-half inches deep, and perforated the victim's chest cavity, rib, pericardial sac surrounding the heart, ascending aorta, right atrium, inferior vena cava, and medial lung at the upper lobe. He said the wounds to the victim's heart were "lethal injuries."

Dr. Laboy testified that the victim sustained a stab wound to the inferior side of one breast that was one and one-eighth inch long and three and one-quarter inches deep. He said the victim suffered an incision of a rib and upper lobe of the left lung, perforation of the pericardial sac, and incision of the left ventricular chamber. Dr. Laboy said that the victim's toxicology analysis showed the presence of ethanol, which could come from alcohol or medication, and that the analysis did not detect the presence of illegal substances. Dr. Laboy said that wounds like the victim's would be fatal within seconds to minutes, depending on the sequence in which they were inflicted.

Kelsey Cooper testified that she spent the night of February 27, 2017, away from the apartment she shared with the victim and Ms. Thornily. She said that her bedroom had a back door exit to the gated parking lot and that she kept the door locked. She said Ms. Thornily called her around 5:45 to 6:00 a.m. to tell her something had happened to the victim. Ms. Cooper said she returned to the apartment but was not permitted to enter. She said that she was taken to the precinct, where a chaplain told her the victim had died. She said she provided information to the police.

Ms. Cooper testified that she was later allowed to return to the apartment and that she found her room "messier" than she had left it. She said all of her jewelry was missing from her jewelry tree stand. Referring to a photograph exhibit, she identified jewelry belonging to her and to the victim. Ms. Cooper said she later realized a ring was missing. She identified photographs of herself wearing the ring, which she said had been a gift from

her aunt. She said the ring had been on the bottom of the jewelry stand when she left the apartment on the night of February 27, 2017. She said she later identified the ring when Detective Chandler showed it to her in mid-March. Ms. Cooper said she did not know the Defendant and never gave anyone permission to enter her bedroom in the apartment and take her jewelry.

Metro Nashville Police Detective Chad Gish, a member of the SISU unit and an expert in mobile phone forensics analysis, testified that he analyzed the contents of three cell phones related to this case. Regarding his analysis of Mr. Baril's cell phone, Detective Gish said it showed a 9-1-1 call on February 28, 2017, at 10:16 a.m.

Detective Gish testified that his analysis of the Defendant's LG cell phone revealed "[q]uite a bit" of information relevant to the investigation. He stated that he used computer software to extract all of the data from the Defendant's cell phone and that data was stored in different databases, depending on the type of data involved, such as text messages, SMS messages, email messages, and call logs. He said he began his review of the extracted data with reference to the timeline he received from detectives relative to the timing of the homicide. In describing the thoroughness of the review of the data on the Defendant's cell phone, Detective Gish said, "His whole phone was analyzed for weeks."

Detective Gish testified that the data in the Defendant's cell phone included information from a Facebook messenger account and the telephone numbers and email addresses associated with the account. Detective Gish said the Defendant's cell phone contained a photograph that had been stored on Facebook which depicted the Defendant wearing a "beanie" with a Nintendo patch. Detective Gish said the image was uploaded to Facebook on February 27 of an unspecified year at 12:47 a.m. He said the photograph was not in the cell phone's photo gallery.

Detective Gish testified that the Defendant's cell phone contained data showing that an internet search had been performed for "Nashville TN stabbing" and that news articles about the crime had been accessed via the cell phone beginning at 9:02 a.m. on February 28, 2017. Detective Gish said the cell phone had been used to search for pawn shops at 9:06 a.m. and that another search was performed seconds later for information about the stabbing. Detective Gish said the next internet search performed with the cell phone was at 3:25 p.m. and that the cell phone was used to view another article about the crime. Detective Gish said these news articles did not contain information about the police having found a knife related to the stabbing. Detective Gish said the cell phone was used at 3:33 p.m. for the search queries "will the rain wash away fingerprints" and "can the rain wash off fingerprint." He said the cell phone was used to access a news article about the stabbing at 3:34 p.m., information about the weather forecast at 3:47 p.m., and articles about the stabbing at 3:50 and 3:53 p.m. He said these news articles did not contain information about recovery of a knife or a computer. He said another news article about the stabbing

was accessed at 3:55 p.m. He said the cell phone was used beginning at 4:03 p.m. to access articles about the incriminating value of fingerprints, how police used fingerprints to "catch criminals," what happened after the police found a person's fingerprints at a crime scene, and how long until police arrested a person after "lifting" fingerprints. He said the cell phone was used to access a news article about the crime at 4:14 p.m. and to access "murder-erotica suffocation" and "bondage suffocation" pornography. He said that the cell phone was used to access articles about the crime at 6:15 and 6:17 p.m. before accessing pornography at 6:37 p.m. Detective Gish said the cell phone was used to search for articles about DNA evidence at 8:33 p.m. He said the cell phone was used to access an article about the identification of the victim at 8:36 p.m., an unrelated crime in Nashville at 8:37 p.m., and a list of "[t]op ten reasons why you should not talk to the police" at 9:06 p.m. Detective Gish said the cell phone was used to access additional information beginning at 11:36 p.m. about DNA evidence, reasons not to talk to the police, obtaining legal assistance, and the length of time a person could be detained by police. Detective Gish said that the Defendant's cell phone was used on March 1, 2017, at 1:08 a.m., to access an article about when *Miranda* rights must be read to a person.

Detective Gish testified that, based upon the information he obtained from the Defendant's cell phone, the police obtained surveillance video from Cash America, a pawn shop near the victim's apartment, which showed the Defendant inside the business a few hours after the crime. Detective Gish said the Defendant appeared to be wearing the same jeans in the Cash America video as he had worn in a photograph taken at 9:00 p.m. on February 27, 2017, and stored on the cell phone.

Detective Gish testified that his analysis of Mr. Williford's cell phone showed calls and text messages between Mr. Williford and the Defendant. Detective Gish said, however, that the records of most of these communications were not present on the Defendant's cell phone. In Detective Gish's opinion, the communications missing from the Defendant's cell phone had been deleted. Detective Gish said text messages between the Defendant and Mr. Williford beginning at 11:09 p.m. on February 27, 2017, discussed their plans to meet later in the evening. Detective Gish said Mr. Williford sent a text message to the Defendant at 12:06 p.m. on February 28 about the location in which Mr. Williford was going "to play." Detective Gish said that thereafter, Mr. Williford and the Defendant exchanged messages about meeting that evening. Detective Gish said the Defendant sent a text message to Mr. Williford at 8:13 p.m., in which the Defendant stated that he was in an interrogation room, that the did not know "what . . . they are talking about," that "some girl got stabbed and killed last night and supposedly they are investigating a bunch of people downtown." Detective Gish said that at 9:05 p.m., the Defendant sent Mr. Williford a text message which stated, "[I]f the cops ever ask you what I was doing, I was drinking, hanging out and I don't have bags or nothing. Just the clothes on my back and got into it with someone. But you don't know much." Detective Gish said he performed a "manual examination" of a database from the cell phone for about one and

one-half days attempting to locate information regarding the usage of the flashlight function but that he was unable to locate a "log file" reflecting when the flashlight function had been used. Detective Gish agreed he had testified at the Defendant's preliminary hearing that the Defendant's cell phone had been used to search for murder erotica suffocation pornography.

The defense did not offer evidence. After receiving the proof, the jury found the Defendant guilty of the charged offenses of especially aggravated burglary, first degree felony murder, first degree premeditated murder, and two counts of theft of property valued at less than $1000. After the trial court imposed the sentence, this appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He argues that his identity as the perpetrator of the offenses was not sufficiently established by the State's proof. The Defendant does not otherwise challenge the sufficiency of the evidence as to the remaining elements of the offenses. The State counters that the evidence is sufficient to establish beyond a reasonable doubt that the Defendant committed the offenses. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to

establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

At the outset, we acknowledge our conclusion in Section II below that the trial court erred in denying the motion to suppress the evidence obtained from the search of the Defendant's cell phone. Thus, this evidence was erroneously admitted at the trial. However, we evaluate the sufficiency of the evidence in light of all of the evidence presented to the jury, including the improperly admitted evidence. *State v. Longstreet*, 619 S.W.2d 97, 99-101 (Tenn. 1981); *State v. Gilley*, 297 S.W.2d 739, 763 (Tenn. Crim. App. 2008). In section II, we will account for the erroneous admission of the evidence by reviewing whether its admission was reversible error or was harmless beyond a reasonable doubt.

The Defendant argues that the evidence placed him near the crime scene but did not establish that he committed the crimes. As we have stated, a crime may be established solely by circumstantial evidence. *Reid*, 91 S.W.3d at 277. Viewed in the light most favorable to the State, the video evidence shows that the Defendant was in the area of the victim's apartment on the night of the offenses, that he attempted to enter cars, and that he entered at least one car. Mr. Dalrymple testified that he had been with the Defendant in the area near the victim's apartment, that he distanced himself from the Defendant when the Defendant tried to break into cars, and that he notified a gas station attendant to call 9-1-1 about the Defendant's activity. Mr. Dalrymple's testimony regarding the 9-1-1 call was corroborated by other evidence. Video surveillance footage showed a man entering the victim's apartment repeatedly, exiting the apartment, placing items outside the apartment, and returning to the apartment. The man wore distinctive torn or ripped jeans, a dark hooded jacket, and a gray beanie. Other evidence established that the Defendant wore clothing that matched this description before the crimes and that he wore the same clothing other than the beanie afterward. A gray beanie with a Nintendo controller patch was later found near the crime scene. The beanie contained the Defendant's DNA, and the beanie matched a beanie worn by the Defendant in a Facebook photograph taken on the night of the crime, in surveillance video from earlier on the evening of the crime, and in surveillance video from the area outside the victim's apartment. A boot print matching the pattern of the Defendant's boot was found on a tire rim at a business near the crime scene. Video surveillance footage showed the suspect's foot land on a tire rim. The Defendant had scratch marks on his neck after the crime, and Mr. Williford said the Defendant had not had them when they were together on the night of February 27, 2017, before the crimes occurred. Regarding the scratches, the Defendant told Mr. Dalrymple he had injured himself on a barbed wire fence, and the suspect was seen scaling a fence in surveillance

video. The victim's computer and a knife from the victim's apartment were found near a fence that was along the path the evidence showed the Defendant had taken when he left the apartment. The Defendant pawned Ms. Cooper's ring hours after the crime, a fact he revealed to Mr. Faulk. Ms. Cooper did not initially realize the ring had been stolen, and the police were unaware of the stolen ring until they learned about it from Mr. Faulk and were able to locate the ring at the pawn shop. Surveillance video from the pawn shop and the paperwork from the transaction corroborated that the Defendant was the person who pawned the stolen ring. Data stored on the Defendant's cell phone included internet searches about the crime, DNA evidence, the effect of rain on fingerprint evidence, the weather forecast, the advisability of talking to the police, and nearby pawn shops. The Defendant's cell phone was used to search for information about a stabbing before information about the victim's manner of death had been released to the media. Data stored on Mr. Dalrymple's cell phone show that the Defendant sent text messages to Mr. Dalrymple asking Mr. Dalrymple to provide false information to the police if he were questioned. The messages had been deleted from the Defendant's cell phone after they were sent. The Defendant confessed the details of the crime to Mr. Faulk, and some of the information the Defendant provided Mr. Faulk had not been publicly disseminated at the time.

Upon review, we conclude that the evidence of the Defendant's identity as the perpetrator of the crimes is sufficient to support the convictions. He is not entitled to relief on this basis.

## II

### Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress the evidence obtained pursuant to a search warrant for the contents of his cell phone. He argues that the search was unconstitutional because the affidavit was overly broad and that the authorities "had no restraint or restrictions in the searching." The State counters that the warrant was particular and not overly broad, and alternatively, that the evidence was admissible pursuant to the good faith exception to the warrant requirement and, as a second alternative, that the admission of evidence obtained pursuant to the warrant was harmless beyond a reasonable doubt. We conclude that the warrant lacked the particularity required by the Fourth Amendment and article I, section 7 of the Tennessee Constitution but that the error was harmless beyond a reasonable doubt.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I § 7. The provisions of the Fourth Amendment and article I, section 7 related to search and seizure are "identical in intent and

-31-

purpose." *State v. Hamm*, 589 S.W.3d 765, 771 (Tenn., 2019) (internal quotations omitted); *see State v. Christensen*, 517 S.W.3d 60, 68 (Tenn. 2017).

In Tennessee, a search warrant must be issued on a finding of probable cause and supported by an affidavit that "sets forth facts tending to establish" probable cause. T.C.A. §§ 40-6-103, -104; *see State v. Williams*, 193 S.W.3d 502, 506 (Tenn. 2006). The affidavit must state facts and not merely conclusory allegations. *State v. Tuttle*, 515 S.W.3d 282, 300 (Tenn. 2017); *State v. Henning*, 975 S.W.2d 290, 294 (1998). "Probable cause generally requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *Williams*, 193 S.W.3d at 506 (citing *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999)). The determination of probable cause is made based upon consideration of the totality of the circumstances. *Tuttle*, 515 S.W.3d at 299. The issuing magistrate should use common sense when determining whether the affidavit supports a finding of probable cause. *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005). We review an issuing magistrate's probable cause determination with great deference. *State v. Melson,* 638 S.W.2d 342, 357 (Tenn. 1982) (citing *United States v. Melvin*, 596 F.2d 492, 498 (1st Cir. 1979)).

Our standard of review in determining whether a search warrant is based upon probable cause is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993). "In reviewing the existence of probable cause for issuance of a warrant, we may consider only the affidavit and may not consider any other evidence known by the affiant or provided to or possessed by the issuing magistrate." *Carter*, 160 S.W.3d at 533. A supporting affidavit must establish a nexus between the criminal activity, the place to be searched, and the things to be seized. *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002)). "Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." *Reid*, 91 S.W.3d at 275.

The search warrant affidavit, sworn to by Detective Chandler on March 10, 2017, sought permission to search a specified black LG cell phone belonging to the Defendant for "[a]ll electronic data related to communication on the phone through calls, text messages, social media, "apps," photos, internet searches, geotags, and all other electronic data found upon the device[.]" In the affidavit, Detective Chandler stated that the information provided is "based upon information received from other law enforcement officers, unless otherwise stated, which [Detective Chandler] believes to be true[.]" The affidavit then stated the following factual information regarding the investigation:

> On 02/28/17 Tiffany Ferguson was discovered in her bedroom with multiple
> stab wounds. The victim was transported to Vanderbilt Hospital where she

was pronounced deceased from the injuries she sustained. Christopher McLawhorn was developed as a suspect during the investigation. Video surveillance showed the suspect use the cell phone flashlight function as he was walking around the parking lot attempting [to] break into vehicles. The phone was also in his possession when he fled on foot from the scene. It is believed that the phone was used after the incident and would have information needed for the investigation to continue[.]

In denying the motion to suppress, the trial court found:

The Defendant challenges [the statement of the items to be searched] in that it authorizes the MNPD to search all of the information on the Black LG cell phone with no limitations related to the alleged criminal homicide. However, just as seen in [United States v. Bass, 785 F.3d 1043 (6th Cir. 2015)], there was no way for MNPD to limit the search to areas solely concerning the alleged criminal homicide. Cell phones are complex machines which hold a multitude of information. A complete search of the cell phone was required to find potential information concerning the alleged criminal homicide.

The facts relied upon to establish probable cause includes surveillance footage of the Defendant possessing and using the Black LG cell phone on the night of the alleged criminal homicide in the parking lot of the alleged victim. The Court finds a nexus between the Defendant, the alleged criminal homicide, and the Black LG cell phone, thus fulfilling the particularity requirement. Additionally, the Court finds the broad scope of the search language was reasonable under the circumstances at the time.

Regarding probable cause, the affidavit states that the Defendant had been identified as a suspect in the victim's stabbing, that video surveillance showed the suspect using a cell phone's flashlight function while trying to break into vehicles in the parking lot of the victim's apartment, and that the suspect fled the scene with the cell phone. The affidavit stated "[i]t is believed that the phone was used after the incident" and that the cell phone contained information pertinent to the investigation. The affidavit did not, however, identify any factual basis for the affiant's belief that the cell phone had been used after the homicide, the manner in which the cell phone was believed to have been used afterward, and any connection between the post-homicide usage and evidence of the homicide. Nevertheless, the affidavit sought a warrant to permit a search of all electronic data on the cell phone. The affidavit sufficiently established a nexus between the criminal activity and the thing to be searched, that is, the cell phone. Although it identified items to be seized, that is, any and all data, the affidavit was deficient in establishing a nexus between "any and all data," the cell phone, and the crime. See Saine, 297 S.W.3d at 206. Although the affidavit alleged usage of the cell phone's flashlight function contemporaneously with the

crime, the affidavit also sought the authority to search "any and all data," without demonstrating a connection between the data and the crimes. In our view, the broad scope of the warrant, without specific information showing that information relevant to the crime would be contained in *all* of the cell phone's data, is problematic.

Thus, we must consider whether the warrant stated the items to be seized with the particularity required by the Fourth Amendment and article I, section 7 of the Tennessee Constitution. The Defendant argues that the scope of the items to be seized was overly broad because it sought to seize all "electronic data" on the cell phone, not specific types of data with a demonstrated nexus to the investigation. The State argues that a broad scope of the search of the Defendant's cell phone was reasonable due to the nature of the data stored on the phone. It argues that the police sought to search for data of a particular character, rather than particular data. The State notes that the investigators did not know whether the type of coding or metadata on the phone might contain information relevant to the homicide and that "the need for broad license to search all forms of electronic data on the cell phone" was demonstrated by Detective Gish's testimony that he was never able to locate data on the cell phone regarding the use of the flashlight function.

This court has said:

The Fourth Amendment requires a search warrant to contain a particular description of the things to be seized. *See Marron v. United States*, 275 U.S. 192, 48 S. Ct. 74, 72 L. Ed. 231 (1927). Article I, Section 7 of our state Constitution prohibits general warrants and T.C.A. § 40-6-103 specifically requires search warrants to describe the property to be seized with particularity. *See Lea v. State*, 181 Tenn. 378, 181 S.W.2d 351 (1944); *Hampton v. State*, 148 Tenn. 155, 252 S.W. 1007 (1923).

. . . .

The prohibition against a general warrant was intended to limit governmental intrusion upon a citizen's privacy and property rights to that shown to the magistrate to be necessary to pursue a legitimate government interest. The particular description requirement is meant to leave little discretion to the officer conducting the search in order to prevent general searches and to prevent the seizure of items upon the mistaken assumption that they fall within the warrant's authorization. *See* 2 Wayne R. LaFave, *Search and Seizure*, § 4.6(a) (2d ed. 1987). "A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981).

-34-

*Meeks*, 867 S.W.2d at 371; *see State v. Reid*, 164 S.W.3d 286, 326 (Tenn. 2005) (stating that a search warrant "must contain a particular description of the items to be seized"); *State v. Henning*, 975 S.W.2d 290, 296 (Tenn. 1998) (stating that in order to satisfy the particularity requirement, the warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized."

Our supreme court has recognized that the items to be seized may be described either as being of a specific identity or as being of a specific character. In *Lea*, 181 S.W.2d at 352-53, our supreme court explained:

> [W]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

*Id.* (quoting *State v. Nejin*, 74 So. 103, 106 (La. 1917); *see Reid*, 164 S.W.3d at 326; *Reid*, 91 S.W.3d at 273-74; *Henning*, 975 S.W.2d at 296.

As we have stated, the affidavit in the present case stated that the cell phone's flashlight function had been used contemporaneously with the crime. The State argues on appeal:

> Defendant's possession of the cell phone and use of the flashlight function during and after his perpetration of the crimes established a substantial basis to believe that the electronic data on the cell phone would contain, not only information about his use of the flashlight function, but also information relevant to the identity of the user of the cell phone; the location of the user before, during, and after the crimes; the user's planning for and concealing of the crimes; and the user's disposing of the proceeds of the crimes.

However, the affidavit sought a warrant to search all data on the cell phone on the basis of a general "belief" that the cell phone had been used after the crimes. No effort was made in the affidavit to identify the type of usage the affiant believed had occurred, such as text messaging, voice calls, and internet searches. Similarly, no effort was made to identify the type of data the affiant believed might exist on the cell phone, such as relevant photographs, browser history of internet searches related to the crimes, or GPS location information. *See Nathanson v. U.S.*, 290 U.S. 41, 44 (1933); *see also Illinois v. Gates*, 462 U.S. 213, 239 (1983). In effect, the affidavit sought unrestricted access to all data on the Defendant's cell

phone without identifying the types of data relevant to the investigation which the affiant had a basis to believe existed.

The Supreme Court has recognized the ubiquitous presence of cell phones in modern life and the fact that they "place vast quantities of personal information literally in the hands of individuals." *Riley v. California*, 573 U.S. 373, 386 (2014). "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id*. at 393. In reality, much of the personal information stored on cell phones is likely unrelated to the crime being investigated and is subject to an individual's Constitutionally protected privacy rights. *See id.* The *Riley* court recognized that contemporary cell phones may contain data with the potential to reveal widely ranging and vastly personal information about an individual unrelated to any criminal activity. *See id.*

Our research reflects that Tennessee appellate courts have yet to address the particularity required of a warrant for the search of a cell phone in light of the wide-ranging data storage capabilities and corresponding privacy concerns of modern cell phones addressed in *Riley*. We have looked, therefore, to decisions from other jurisdictions for guidance.

In *State v. Henderson*, 854 N.W.2d 616 (Neb. 2014), the Nebraska Supreme Court considered the validity of warrants which stated probable cause that an identified cell phone would contain evidence but which authorized a search of "any and all" data contained on the cell phone. The *Henderson* court noted that the Fourth Amendment contained both a requirement for a finding of probable cause and a particularity requirement. *Henderson*, 854 N.W.2d at 32. The *Henderson* court echoed the concerns expressed by the Supreme Court in *Riley* regarding the unique "quantitative and qualitative" capacities of cell phones to hold vast amounts of many types of information, to function as "'a digital record of nearly every aspect of their [owners'] lives,' and to 'access data located elsewhere.'" *Id.* (quoting *Riley*, 573 U.S. at 395-97). Thus, the privacy rights of a cell phone owner compel that the Fourth Amendment's particularity requirement be observed by defining the limits of the scope of a search "to allow a search of only that content that is related to the probable cause that justifies the search." *Id.* at 289. To that end, "[a] warrant satisfies the particularity requirement if it leaves nothing about its scope to the discretion of the officer serving it." *Id.* (citing *U.S. v. Clark*, 754 F.3d 401 (7th Cir. 2014)). The warrants in *Henderson* specified certain types of data, including calls and text messages, but the warrants also included authorization to search "[a]ny and all information." *Id.* The court noted the discussion in state and federal courts regarding whether a protocol for searching a cell phone must be specified in a warrant. *See id.*; *see also In re Search of Black iPhone 4*, 27 F. Supp. 3d 74 (D.D.C. 2014); *In re Search of ODYS LOOX Plus Tablet*, 28 F. Supp. 3d 40 (D.D.C. 2014); *In re Search of Apple iPhone, IMEI 013888003738427*, 31 F. Supp. 3d 159 (D.D.C. 2014). The *Henderson* court projected that the permissible parameters of

a search warrant for the contents of a cell phone would continue to develop in *Riley*'s wake, but the court concluded that a warrant for the search for "any and all" data was beyond the scope of the Fourth Amendment's particularity requirement. *See Henderson*, 854 N.W.2d at 289.

The Nebraska Supreme Court had the occasion to revisit the parameters of the Fourth Amendment as it pertains to the particularity required for a cell phone search in *State v. Goynes*, 927 N.W.2d 346 (Neb. 2019). The *Goynes* court observed the following about the affidavit:

> [The detective's] affidavit provided probable cause that [the defendant] committed the shooting and that he was aided by others. When [the defendant] was taken into custody, he had the cell phone in his possession. [The detective] explained cell phone data provides insight for criminal investigations on the motivation, method, and participants in that cell phones are used for communication, access to information, socialization, research, entertainment, shopping, and other functionality. Accordingly, [the detective] listed several types of data he was seeking to search through the warrant and how the data was relevant to the investigation. These types of data included the following: cell phone information, configurations, calendar events, notes, and user account information which could identify who owns or was using a cell phone; call logs which could establish familiarity between people involved and timelines of an incident; short and multimedia messaging service messages, chat and instant messages, and emails which could provide insight to establish an individual's level of culpability and knowledge of the incident; installed application data which could aid in determining a user's historical geographic location and demonstrate the user's association with investigated people, location, and events; media files such as images, videos, audio, and documents which could provide times and locations, as well as firsthand documentation of the incident; internet browsing history which could demonstrate the planning, desire, and participation in a crime; cell tower connections, global positioning system data, Wi-Fi, Bluetooth, and synchronization logs which could provide information on location in relation to the incident; and user dictionary information which could demonstrate familiarity with the crime being investigated.

*Goynes*, 927 N.W.2d at 355-56. The Nebraska Supreme Court held that, in contrast with *Henderson*, the *Goynes* affidavit was sufficiently particular because it identified and described the specific areas of the cell phone to be searched and described the information held in those areas which were relevant to the investigation. *Id.* at 144. The court

-37-

concluded, therefore, that the warrant met the Fourth Amendment's particularity requirement. *Id.*

In considering the present case, we are guided by the principles of *Henderson* and *Goynes*. As we have stated, the affidavit in the case at bar sought an unfettered search of all data on the Defendant's cell phone. *See In re Nextel Cellular Telephone*, No. 14-MJ-8005-DJW, 2014 WL 2898262, at *13 (D. Kan. 2014) ("[P]robable cause to believe drug trafficking communication may be found in [the phone's] mail application will not support the search of the phone's Angry Birds application."). Likewise, aside from its mention of usage of the cell phone's flashlight function, the affidavit did not specify the specific types of data which had relevance to the investigation or the factual basis for the affiant's belief that the data existed. We conclude that the affidavit failed to meet the particularity requirement of the Fourth Amendment and article I, section 7. As such, the trial court erred in denying the Defendant's motion to suppress the evidence obtained from the search of the Defendant's cell phone.

In reaching this conclusion, we have considered *United States v. Bass*, 785 F.3d 1043 (6th Cir. 2015), upon which the trial court relied and which the State cites in its brief. In *Bass*, "the warrant sought evidence of fraudulent conduct related to charges of 'Wire Fraud, Credit Fraud, [and] Identity Theft.'" *Bass*, 785 F.3d at 1049. The defendant in *Bass* "was convicted of masterminding a fraud conspiracy that used stolen identities and hijacked credit card accounts to purchase over $150,000 in merchandise from Detroit-area retailers." *Id*. at 1046. When officers arrived at the defendant's home to arrest him, they saw him typing into the cell phone for several minutes while refusing to open the door to them. *Id.* On appeal, the defendant argued that the warrant for his cell phone failed the particularity requirement because it authorized a search of "any records of communication, indicia of use, ownership, or possession, including electronic calendars, address books, e-mails, and chat logs." *Id.* at 1049. The affidavit in question stated that the crimes of which the defendant was suspected were ones in which "cell phones were frequently used by conspirators to text or call each other during the times that the fraudulent activity was taking place," that the defendant had continued using his cell phone before opening the door to the authorities, and that the affiant "believe[d] that Bass was possibly attempting to alert other conspirators of [his] arrest by texting or attempting to call after he was notified of the Arrest Warrant." *Id*. We note that the defendant in *Bass* had not raised the issue in the trial court and that the Court of Appeals' review was limited to consideration of plain error. In that context, the court observed that federal courts had generally rejected challenges to the search of entire personal or business computers on the basis that criminals often hid, mislabeled, or manipulated files to conceal criminal activity, thereby justifying an expansive search of the device. *Id.* The appellate court concluded that the search was reasonable in view of the totality of the circumstances. *Id.* at 1050.

The differences in *Bass* and the present case are striking. *Bass* involved complex financial crimes committed by multiple individuals, and the affidavit recited both that the defendant had been seen using the cell phone when the authorities arrived to arrest him, raising the possibility that he was alerting co-conspirators to the presence of law enforcement, and that crimes of this nature often involved cell phone usage through text messaging and voice calls. In contrast, the present case involved a homicide committed by a single suspect, who was seen using the flashlight function of a cell phone. The principles of *Bass* are not compelling in relation to the present case.

The State argues in the present case that even if this court determines, as we have, that the warrant is invalid, the evidence was nevertheless admissible pursuant to the good-faith exception to the exclusionary rule, whereby a search conducted in good faith pursuant to a search warrant later ruled to be constitutionally defective would not result in suppression of the evidence obtained from the search under the exclusionary rule of the Fourth Amendment. *See United States v. Leon*, 468 U.S. 897, 919-22 (1984). Tennessee first adopted the good-faith exception for evidence which had been seized in accord with binding precedent existing at the time. *See State v. Reynolds*, 504 SW.3d 283 (Tenn. 2016). Tennessee went on to adopt the good-faith exception in limited circumstances involving technical flaws in otherwise valid warrants. *See State v. Davidson*, 509 S.W.3d 156, 185-86 (Tenn. 2016); *see also State v. Daniel*, 552 S.W.3d 832, 841 (Tenn. 2018); *State v. Lowe*, 552 S.W.3d 842, 859 (Tenn. 2018). Tennessee has also adopted the good-faith exception "'when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements.'" *State v. McElrath*, 569 S.W.3d 565, 578 (Tenn. 2019) (quoting *Herring v. U.S.*, 555 U.S. 135, 147-48 (2009)).

As the trial court correctly noted in its order denying the motion to suppress, to the extent that the Tennessee Supreme Court has adopted the good-faith exception, its reach does not extend to the facts of this case under existing precedent. As an intermediate appellate court, we are obligated to apply existing law. *See State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999).

Alternatively, the State contends that the admission of the evidence obtained from the Defendant's cell phone was harmless beyond a reasonable doubt. With this we agree. In evaluating whether a non-structural constitutional error requires reversal, "the test is 'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 2008) (internal quotation marks omitted)); *see Neder v. United States*, 527 U.S. 1, 15, (1999); *Chapman v. California*, 386 U.S. 18, 24 (1967).

Even without the evidence of the Defendant's identity provided by the cell phone data, the trial proof of the Defendant's guilt was overwhelming. Surveillance video showed

the Defendant breaking into cars near the victim's apartment before the crime, and the video footage showed him moving in and out of the apartment and placing stolen items outside. A print matching his boot was found on a tire rim along the path the surveillance footage showed he took when he left the scene. Mr. Williford testified that when he was interviewed by the police, he identified a person in a "toboggan-like hat" near the victim's apartment as the Defendant. Mr. Williford provided the authorities with his cell phone, which contained text messages from the Defendant in which the Defendant asked Mr. Williford to lie to the police and say the Defendant had no belongings other than the clothes he wore. The Defendant confessed details of the crimes to Mr. Faulk which had not been publicly disseminated, including the Defendant's having pawned a ring stolen from the victim's apartment. The ring had not been reported as having been stolen because Ms. Cooper had not realized it was missing. From this information, the authorities found surveillance footage recorded hours after the crimes showing the Defendant conducting the pawn transaction. The Defendant provided his identification to the pawn shop during the transaction.

The denial of the motion to suppress the evidence was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE